**Edwin H. HELFANT, Appellant,**

**v.**

**George F. KUGLER, Attorney General of the State of New Jersey, et al.**

**No. 73-1386.**

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1973.

Submitted under Third Circuit Rule 12(6) Nov. 19, 1973.

Reargued April 10, 1974.

Decided July 8, 1974.

Certiorari Granted Nov. 18, 1974. See 95 S.Ct. 492.

Perskie & Callinan, by Marvin D. Perskie, Wildwood, N. J., Patrick T. McGahn, Jr., Atlantic City, N. J., Norman L. Zlotnick, Wildwood, N. J., for appellant.

George F. Kugler, Jr., Atty. Gen. of N. J., Trenton, N. J., David S. Baime, Alfred J. Luciani, Edward C. Laird, Deputy Attys. Gen., for appellees.

Before STALEY, ADAMS and GIBBONS, Circuit Judges.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

OPINION OF THE COURT

ALDISERT, Circuit Judge.

Presenting a delicate question of federal-state comity, this appeal requires us to decide whether federal fact-finding should be utilized to determine whether a New Jersey municipal court judge's testimony before a state grand jury was the product of a free and unconstrained will. Contending that his Fifth Amendment rights as guaranteed by the Fourteenth Amendment will not be vindicated by the New Jersey state court system, appellant argues that the federal courts should provide relief because highly unusual circumstances dictate an exception to the familiar restrictive rule of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

I.

This is an appeal from an order of the district court which (1) denied plaintiff's request for a preliminary injunction prohibiting the Attorney General of New Jersey and others from proceeding with the prosecution of an indictment pending in that state,[1] and (2) granted the defendants' motion, under Rule 12(b)(6) F.R.Civ.P., to dismiss the complaint for failure to state a claim upon which relief could be granted. The district court held an evidentiary hearing on the motion for a preliminary injunction, and made limited findings of fact. The appeal was argued before a panel of this court on September 7, 1973. Deeming the issues raised to be substantial, the trial on the challenged indictment being scheduled to commence on September 10, 1973, and the Attorney General of New Jersey declining to postpone it until the panel could decide the case, the

---

1. The plaintiff was arraigned on the Indictment SGJ 10–72–10 on February 2, 1973. Trial was originally set for May 14, 1973.

The state's brief in support of its motion to dismiss in the district court discloses:

Plaintiff herein, Edwin Helfant, stands charged in a nine count indictment handed up by the State Grand Jury charging him with conspiring with his codefendant, Samuel Moore, to obstruct justice, with obstructing justice in connection with his codefendant, Samuel Moore, with aiding and abetting compounding a crime and with four counts of false swearing. * * * All of the substantive offenses stem from the wrongful dismissal of an atrocious assault and battery complaint which resulted from a fight in a tavern in Egg Harbor City on March 17, 1968. The false swearing counts in the indictment stem from the appearance of the defendant before the grand jury on November 8, 1972.

panel entered an order enjoining the prosecution until such time as the appeal could be decided. Panel opinions were filed on September 10 reversing and remanding for further proceedings. Thereafter, representing that the State was willing to delay plaintiff's trial until disposition of the application for rehearing, the state attorney general petitioned for rehearing. Based on that representation, we recalled our mandate on September 21, 1973. Rehearing was granted before the panel; supplemental briefing was ordered on certain issues suggested by the appeal which had not been previously briefed or argued; and the panel subsequently granted some relief, one judge dissenting. Because of important federal-state comity questions, the full court subsequently agreed to hear the case in banc.

## II.

Plaintiff-appellant, Helfant, a member of the New Jersey bar and a former municipal court judge of that state, alleged in a verfied complaint that he had been advised that he was the target of a state grand jury investigation into an alleged withdrawal of a criminal charge of atrocious assault and battery. Armed with this information, and asserting a Fifth Amendment privilege, Helfant refused to testify when he first appeared before the state grand jury on October 18, 1972. He was subsequently subpoenaed to appear again before the grand jury on November 8, 1972, which was then sitting at the Trenton State House Annex on the same floor as the chambers of New Jersey State Supreme Court justices. Helfant was also directed to appear before the justices of the Supreme Court in their private chambers 10 minutes before his scheduled re-appearance before the grand jury.

The complaint averred that upon his appearance in the Supreme Court chambers, several justices asked questions about the subject matter of the grand jury investigation, including matters not then made public and also including inquiries concerning certain witnesses who had testified against Helfant before the grand jury.[2]

His complaint averred that "[a]fter . . . [he] left the Supreme Court chambers, he was in a state of confusion and bewilderment and had to go immediately before the State Grand Jury. * * * As a result of these questions, [by justices of the Supreme Court,] the plaintiff, whose previous counsel-advised intentions and will were completely dis-

2. Helfant's complaint avers:
He was questioned by the Chief Justice [Weintraub] and Associate Justice Sullivan in the presence of the Court. The Chief Justice inquired of the defendant whether he thought a Judge should invoke the Fifth Amendment. Justice Sullivan asked what the plaintiff's feelings were about a Judge sitting in judgment of other people while he himself was invoking the Fifth Amendment before a Grand Jury. He also asked plaintiff if he had sat as a Judge since invoking the Fifth Amendment. Chief Justice Weintraub and another Justice also asked of plaintiff some questions about his son's Bar Mitzvah, which matters were contemporaneously being considered by the State Grand Jury, including seating arrangements and who paid for the liquor. These questions also concerned an Abe Schusterman, who was a State's witness against the plaintiff and who had appeared before the State Grand Jury. The Chief Justice also questioned plaintiff about Atlantic County Judge Thomas Rauffenbart and about an ice-making machine that was involved in an alleged pay-off in a criminal case involving Abe Schusterman, all of which matters were then being considered and investigated by the State Grand Jury which was being conducted by the defendant Joseph A. Hayden, Jr. under the direction of Attorney General George F. Kugler.

The questions posed to the plaintiff by the Justices of the Supreme Court were in connection with matters then being considered by the State Grand Jury. There had been no public release of these matters, particularly the Bar Mitzvah, seating arrangements thereat, arrangements for the liquor and the gift of an ice machine. These matters had to be a portion of the raw evidence then being considered by the State Grand Jury and released and given to the Supreme Court during the pendency of the Grand Jury proceedings by defendant Deputy Attorney General Joseph A. Hayden, Jr., who was conducting the Grand Jury investigation.

carded and overcome and who was quite emotionally upset by the confrontation, indicated to the Justices that he would indeed waive his Fifth Amendment privilege and testify in full before the State Grand Jury, fearing not only the loss of his Judgeship, but his accreditation as a member of the bar as well."

Helfant also averred that Deputy Attorney General Hayden, conducting the grand jury investigation, entered the Supreme Court chambers after plaintiff left and that Hayden had also preceded the plaintiff into the chambers.

Finally, his complaint alleges:

14. As a result of the intrusion by the Deputy Attorney General and the disclosure to the Supreme Court of factual matters involved in a Grand Jury investigation during pendency of that investigation, and because of the intrusion of the New Jersey Supreme Court into the Grand Jury investigation and the communication between the Supreme Court of New Jersey and the Deputy Attorney General conducting the Grand Jury investigation, the plaintiff herein is made to suffer

great, immediate, substantial and irreparable harm in that he must attempt to defend criminal charges brought in a State in which there has been prejudicial collusion directly affecting plaintiff, whether intentional or inadvertent between the Judicial and Executive branches of the New Jersey State government. Plaintiff is being made to defend criminal charges which have been obtained, inter alia, as a result of that collusion, and the deprivation of plaintiff's constitutional rights by not too subtle cooperative coercion on the part of the defendants. Furthermore, in the event of his conviction upon any one of the charges presently pending against him, plaintiff's only recourse would be review by the State Courts and ultimately the New Jersey Supreme Court, which Court he has alleged has been involved in the prosecution of the charges against him.

At the injunction hearing Helfant presented the testimony of Patrick T. McGahn, one of his attorneys, and testified himself. Relevant testimony by Helfant is set forth in the margin.[3]

3. Q. What was your intention with regard to appearing and testifying before the State Grand Jury on that date before you arrived at Trenton?

A. Well actually I had no intention, Mr. Perskie, because Mr. Sullivan had said something about immunity and I had already invoked the Fifth Amendment and I didn't intend to testify about anything. I asked you in the car what are they going to give me immunity for?

*      *      *      *      *

Q. Were they sitting in their robes?

A. Yes, sir, I think they were; yes, sir.

Q. Now what happened when you came in?

A. I walked in and without any good mornings or anything else, the Chief Justice asked me if I thought it right for a Judge to invoke the Fifth Amendment.

*      *      *      *      *

Q. And what was your state of mind and your feelings as you entered those Chambers?

A. Well Mr. Perskie, I couldn't understand why they wanted me on such short notice, five minutes or ten minutes before the Grand Jury hearing and I was scared.

Q. Now you said the Chief Justice said something to you. Relate the conversation that took place as nearly as you can?

A. The Chief Justice asked me if I thought it right for a Judge to invoke the Fifth Amendment? And I said, Mr. Chief, before I can answer that I'd like to explain. He said, I don't want to get into the merits. I just want you to answer the question. And I said, well the answer to your question is no, I don't think it right; but I said, I would like to explain; and he. said, no explanation is necessary.

Q. Was there any other conversation?

A. Mr. Justice Sullivan, who had just been appointed and I recognized him, I never met Justice Sullivan before; asked me if I had sat in the Municipal Court since· I had invoked the Fifth Amendment; and I told him I had sat once in Somers Point; and he then asked, do I think it right to sit in judgment of other people when I myself had invoked the Fifth Amendment and refused to answer certain questions that were posed to me.

Q. What did you respond?

A. I then tried to tell Justice Sullivan about the three convicts and the reports

By oral opinion the district court denied preliminary injunctive relief on the ground that Younger v. Harris, *supra,* precluded federal intervention. It also dismissed the complaint for failure to state a claim for which relief can be granted. In the posture in which this case is before us, the district court has ruled only on the legal sufficiency of the complaint, pursuant to the Rule 12(b)(6) motion. "Findings of fact . . . are unnecessary on decisions of motions under . . . [Rule] 12. . . ." Rule 52(a), F.R.Civ.P. Although an evidentiary hearing on the injunction request was conducted, and the court made limited findings thereon, it did not find facts with respect to the merits of Helfant's § 1983 claim. Thus, there have been no fact-findings on the crucial issue of whether Helfant's testimony before the grand jury was the product of his free and unconstrained will. Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Haynes v. Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

"Since Chambers v. Florida, 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716], . . . [the Supreme] Court has recognized that coercion can be mental as well as physical. . . ." Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). "When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal." Watts v. Indiana, 338 U.S. 49, 53, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949). The decision must be freely as well as rationally made. Blackburn v. Alabama, *supra,* 361 U.S. at 208, 80 S.Ct. 274.

### III.

Because we are reviewing a Rule 12(b)(6) dismissal order, we must take as true Helfant's allegations that his testimony before the grand jury was not the product of a free and unconstrained will and that he is about to be tried on an indictment containing charges emanating from that coerced testimony.

Younger v. Harris, *supra,* 401 U.S. at 53, 91 S.Ct. at 755, holds that a federal court should not enjoin a pending state prosecution in the absence of a showing of bad faith, harassment or other "extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harass-

---

that I had had of what they were saying and I felt that the only way I could protect myself, and the Chief Justice then said, we do not want to get into the merits; and I was cut off from saying any more. The Chief Justice then began to ask me about an ice maker that I was suppose to have purchased for Judge Rauffenbart and I told him I had purchased one and I had a receipt for it and cancelled check; and he then began to inquire about this fellow Schusterman and was Schusterman at my son's Bar Mitzvah and I tried to explain how he happened to be there, that he supplied the novelties and the favors. The Chief Justice asked me about the seating arrangements for the Bar Mitzvah and then he asked me who had purchased the liquor for the Bar Mitzvah, whether Mrs. Schusterman was there and whether I had purchased any other gifts for Judge Rauffenbart. He asked if formal invitations were sent out. It was basically things pertaining to Abe Schusterman who I had known had testified on the 25th of October, one week before.

Q. Now was there any file in the presence of the Chief Justice?

A. There was a file in front of the Chief Justice, Mr. Perskie, but it was closed and it was with the same brown folder that was submitted to you by Mr. Hayden in your request with the clasp on the top of it. I don't absolutely recall Mr. Perskie, everything that went on in front of the Supreme Court.

Q. How long would you say you were totally, the total time you were before the Court?

A. It wasn't longer than ten or twelve minutes, Mr. Perskie.

Q. And when you came out—

A. Well, there was one other question the Chief asked me and I think it was the tone, when he said, what do you intend to do today?

Q. And what did you tell him?

A. I said, Mr. Chief Justice, I am going to testify.

N.T. 22–26.

ment." Conover v. Montemuro, 477 F. 2d 1073, 1080 (3d Cir. 1973); *See*, Lewis v. Kugler, 446 F.2d 1343 (3d Cir. 1971). Neither the Supreme Court nor this court has considered what extraordinary circumstances will justify federal intervention in a pending state prosecution. But the predicate of Younger v. Harris is an assumption that defense of the pending state prosecution affords an adequate remedy at law for the vindication of the federal constitutional right at issue. Thus, invocation of the "extraordinary circumstances" exception must bring into play the suggestion of an inability of the state forum to afford an adequate remedy at law.

By his complaint, plaintiff alleges that he was coerced by members of the State Supreme Court into relinquishing his Fifth Amendment right not to testify before the grand jury. He asserts that he then did testify, and that, as a result, he was indicted because of his allegedly coerced testimony. Helfant also avers that a New Jersey trial court has declined his motions to dismiss indictments emanating therefrom, on the ground that they were based on his coerced testimony. *See, e. g.,* United States v. Calandra, 414 U.S. 338, 94 S. Ct. 613, 38 L.Ed.2d 561 (1974).

Under the unusual circumstances of this case, can it be said that the appellant may not vindicate his constitutional rights by a defense in "a single criminal prosecution"? Otherwise stated, do the administrative powers of the New Jersey Supreme Court, in the factual complex giving rise to appellant's constitutional claims, threaten his opportunity for the vindication of his federal rights in the New Jersey state court system? Thus our analysis requires an examination of the "power parameters" of the New Jersey Supreme Court.

## IV.

The New Jersey Constitution provides: "The Chief Justice of the Supreme Court shall be the administrative head of all the courts in the State." Article VI, § 7, Par. 1. "The Chief Jus-

tice of the Supreme Court shall assign Judges of the Superior Court to the Divisions and Parts of the Superior Court, and may from time to time transfer Judges from one assignment to another, as need appears. Assignments to the Appellate Division shall be for terms fixed by Rules of the Supreme Court." Article VI, § 7, Par. 2.

"Thus this court is charged with responsibility for the overall performance of the judicial branch. Responsibility for a result implies power reasonably necessary to achieve it. More specifically, the power to make rules imports the power to enforce them." In re Mattera, 34 N.J. 259, 168 A.2d 38, 45 (1961).

"The constitutional administrative power is absolute and unqualified, and our Supreme Court has characterized it as the 'plenary responsibility for the administration of all courts in the State.' State v. De Stasio, 49 N.J. 247, 253, 229 A.2d 636, 639, cert. den. 389 U.S. 830, 88 S.Ct. 96, 19 L.Ed.2d 89 (1967). See in re Mattera, 34 N.J. 259, 271–272, 168 A.2d 38 (1961). See also N.J.Const., Art. XI, § IV, par. 5; *cf.* N.J.Const., Art. VI, § VII, par. 1. Additionally, compare Kagan v. Caroselli, 30 N.J. 371, 379, 153 A.2d 17, 21 (1959), wherein the court observed that '[t]he Constitution places the administrative control of the municipal court in the Supreme Court and the Chief Justice. Art. VI, § 2, par. 3; Art. VI, § 7, par. 1. There is no room for divided authority.'

"The intent of the 1947 Constitutional Convention was to vest the Supreme Court with the broadest possible administrative authority. Conceptually, such authority encompasses all facets of the internal management of our courts. *Cf.* Mattera, *supra,* 34 N.J. at 272, 168 A.2d 38. This was made clear by the Committee on the Judiciary which considered it a fundamental requirement that the courts be vested with 'exclusive authority over administration.' 2 Proceedings of the Constitutional Convention of 1947, at 1180, 1183." Lichter v. County of Monmouth, 114 N.J.Super. 343, 276 A.2d 382, 385–86 (1971).

Thus, it becomes readily apparent that the Supreme Court of New Jersey is more than an appellate court. Its "constitutional administrative power is absolute and unqualified." The Chief Justice "may from time to time transfer Judges from one assignment to another." The Supreme Court may assign judges to the Appellate Division for terms fixed by its own rules. The Supreme Court is vested with formidable supervisory and administrative power extending not only to the trial court level but to the Appellate Division as well.

Given the posture of this case, requiring that we assume that the allegations charging coercion by the Supreme Court are true, the next question appears to be whether the appellant may vindicate his constitutional rights in this case in a state court system which functions under the "absolute and unqualified" administrative power of its highest court.

## V.

Distilled to its essence, appellant's argument is that the factual involvement of the New Jersey Supreme Court would destroy the objectivity of the entire state court system in processing his constitutional claim. But the schema of judicial review of federal constitutional questions presented in the state cases is not confined to the state court system. If convicted, and if persuaded that principles of federal constitutional law were not properly applied in the state system, Helfant will have the opportunity of applying for certiorari to the United States Supreme Court, 28 U.S.C. § 1257(3), and if given a custodial sentence, will have the additional right to apply to a federal forum for federal habeas corpus relief, 28 U.S.C. § 2254.

What complicates this particular case, however, is that the resolution of Helfant's specific contention will not be confined to interpreting, refining, or defining principles of constitutional law. Critical to the eventual constitutional interpretations is the threshold determination of whether Helfant's testimony before the grand jury was the product of a free and unconstrained will. This is not a question of law. It is a question of fact—narrative or historical facts as to what occurred and operative or constitutional facts as to the voluntariness of his actions. Schneckloth v. Bustamonte, supra, 412 U.S. at 227, 93 S.Ct. 2041. And some fact-finder must decide these.

We have not been directed to, nor has our research disclosed, any procedure by which this factual determination may be made by a jury. In New Jersey criminal law procedures, as is the case in federal practice, ultimate facts found by criminal court juries are merely verdicts of guilty or not guilty. The factual determination of the "free and unconstrained will" question within the state system will be made by a New Jersey state judge, a state judge subject to the "absolute and unqualified" administrative power of the Supreme Court, whose findings are presumably reviewable by an Appellate Division, assignment to which shall be by terms fixed by the rules of the Supreme Court, with a possibility of ultimate review by the New Jersey Supreme Court itself.[4] Thus, the

4. The New Jersey Supreme Court has set forth in detail the scope of appellate review of facts found by a trial judge: "There can be no doubt of the *power* of the appellate tribunals of this State . . . to review the fact determinations of a trial court in all cases heard without a jury and to make new or amended findings. * * * The aim of . . . review . . . is . . . to determine whether the findings could reasonably have been reached on sufficient credible evidence present in the record. * * * But if the appellate tribunal is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction . . . then, and only then, it should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions." State v. Johnson, 42 N.J. 146, 199 A.2d 809, 816–818 (1964). *See also*, State v. Yough, 49 N.J. 587, 231 A.2d 598, 602 (1967); State v. Daly, 126 N.J.Super. 313, 314 A.2d 371, 373 (1973). The Supreme Court, in reviewing the decision of the Appellate Division, may itself deem it appropriate to conduct a *de novo* review. State v. Johnson, *supra*, 199 A.2d at 818.

New Jersey state court system would play an important role in both the fact-finding process and the review thereof, although upon acceptance of certiorari, "it is . . . [the U.S. Supreme Court's] duty . . . to examine the entire record and make an independent determination of the ultimate issue of voluntariness." Davis v. North Carolina, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966).

A litigant has come into a federal court asking for vindication of a federal constitutional right which is critically dependent upon a finding arising out of circumstances in which six of seven members of the New Jersey Supreme Court as then constituted are alleged to be directly involved. If denied federal relief, appellant will be restricted to a judicial procedure in which the resolution or modification of factual determinations would be committed to a court system under the administrative supervision of the participants in the factual complex. This presents an extremely awkward position.

## VI.

To determine whether there should be an exercise of even limited federal judicial power under these circumstances requires a brief review of those fundamental principles which govern federal-state relations. Initially, the federal courts have subject matter jurisdiction of an action commenced by a person "[t]o redress the deprivation, under color of any State law . . . custom or usage, of any right, privilege or immunity secured by the Constitution of the United States. . . ." 28 U.S.C. § 1343(3). Congress has afforded Helfant a remedy to bring "an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. And the Supreme Court has held that this may be by means of injunction, Mitchum v. Foster, 407 U.S. 225, 92 S.

Ct. 2151, 32 L.Ed.2d 705 (1972), or by declaratory judgment, Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L. Ed.2d 505 (1974).

In the sensitive and delicate area of federal-state relations, where the power of government is divided between a federation and its member states, there is no constitutional barrier, and since Mitchum v. Foster, *supra*, no absolute Congressional barrier, to federal court intervention in state criminal proceedings.

"The power reserved to the states under the Constitution to provide for the determination of controversies in their courts may be restricted by federal district courts only in obedience to Congressional legislation in conformity to the judicial Article of the Constitution. Congress, by its legislation, has adopted the policy, with certain well-defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this Court of any federal questions involved." Douglas v. City of Jeannette, 319 U.S. 157, 162–163, 63 S.Ct. 877, 880–881, 87 L.Ed. 1324 (1943).

In Stefanelli v. Minard, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951), Mr. Justice Frankfurter emphasized that this policy of federal court restraint is based on "[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law. . . ." "Regardless of differences in particular cases, however, the Court's lodestar of adjudication has been that the statute [Civil Rights Act] 'should be construed so as to respect the proper balance between the States and the federal government in law enforcement.' Screws v. United States, 325 U.S. 91, 108, [65 S.Ct. 1031, 89 L.Ed. 1495]." *Ibid.*, at 121, 72 S.Ct. at 121.[5]

5. "Mr. Justice Holmes dealt with this problem in a situation especially appealing: 'The relation of the United States and the Courts of the United States to the States and the Courts of the States is a very delicate matter that has occupied the thoughts of states-

Mr. Justice Black would emphasize in Younger v. Harris, *supra*, 401 U.S. at 44, 91 S.Ct. at 750: "This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism,' and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."

■ Thus, federal judicial policy against intervention in state criminal proceedings is bottomed on an unwillingness for federal *disturbance* of "the notion of 'comity,' that is, a proper respect for state functions," state institutions, and especially, state court systems. We now proceed to determine whether some minimum exercise of federal authority in these proceedings will *disturb* or whether it will *implement* this proper respect for state functions.

VII.

■ So posited, we reject appellant's basic contention that he is entitled to a federal order permanently enjoining the prosecution of the indictments. "[C]ourts of equity in the exercise of their discretionary powers should . . . [refuse] . . . to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent; and equitable remedies infringing this independence of the states—though they might otherwise be given—should be withheld if sought on slight or inconsequential grounds." Douglas v. City of Jeannette, *supra*, 319 U.S. at 163, 63 S.Ct. at 881. In the context of permanently enjoining the state prosecution, we do not find bad faith or harassment, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), nor do we find this to be one of those "exceptional cases," Douglas v. City of Jeannette, *supra*, or "extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." Younger v. Harris, *supra*, 401 U.S. at 53, 91 S.Ct. at 755. We have not been persuaded that Helfant will be precluded from asserting constitutional rights in his defense of a single criminal proceeding. Younger v. Harris, *supra*.

We find no reason to depart from the formidable general policy of "leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this [Supreme] Court of any federal questions involved." Douglas v. City of Jeannette, *supra*, 319 U.S. at 163, 63 S.Ct. at 881.

men and judges for a hundred years and cannot be disposed of by a summary statement that justice requires me to cut red tape and intervene.' Memorandum of Mr.

Justice Holmes in V. Sacco/Vanzetti Case, Transcript of the Record (Henry Holt & Co., 1929) 5516." *Ibid.*, 342 U.S. at 124–25, 72 S.Ct. at 122.

The considerations which militate against granting a permanent injunction against the conduct of the state trials do not surface, however, when considering the limited relief of a federal declaratory judgment as to whether Helfant's testimony before the grand jury was the product of his free and unconstrained will. If limited federal intervention is permitted, the state court system will ultimately be free to conduct the trials and appeals, if any, as an independent judiciary, free from any interference.

Since Helfant has a statutory right to have a claim for declaratory relief adjudicated in the federal courts, and will be denied the opportunity to be heard only if there is a threat to the delicate structure of comity between the federal and state systems, our next task is to examine the effect of limited federal fact-finding under these highly sensitive circumstances.

Judges in a free society regard even the appearance of a biased decision as more harmful than a result they personally disapprove. Lord Herschell's remark to Sir George Jessel comes to mind: "Important as it was that people should get justice, it was even more important that they should be made to feel and see that they are getting it." [6]

In the context of this highly unusual factual complex, it is critical that traditional respect for an outstanding state court system be nurtured, preserved, and supported; that the state court process this indictment without the slightest suggestion that it is unable to perform its function without total objectivity, or that there be even the appearance of any infirmities. Federal court action which seeks to guarantee such an appearance and which bolsters and enhances the reputation of a state court system does not denigrate comity. Indeed, it supplies a positive affirmation of the high respect the court system of one sovereign extends to that of another. To order federal fact-finding within an extremely narrow compass, under these circumstances, comports with, rather than offends, the mutual relationship poignantly described by Justice Black as "Our Federalism."

Such limited use of authorized power will free the New Jersey court system of any suggestion that a fact-finding on the voluntariness issue by a trial judge in this case would be influenced, consciously or unconsciously, by the "brooding omnipresence" of the New Jersey Supreme Court. At the same time if the case proceeds to a state appellate level, judges of the reviewing courts will be able to adjudicate any federal constitutional questions with maximum freedom. Moreover, if the case should proceed to the New Jersey Supreme Court, that court will not be placed in an untenable situation of being a court of review as to findings of facts in which they are allegedly participants.

We are persuaded that there will be total "sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." Younger v. Harris, *supra*, 401 U.S. at 44, 91 S.Ct. at 751. Thus, by a federal resolution of this limited issue, the factual predicate of the appellant's federal claim will be resolved in the federal forum and, at the same time, the state will be completely free to proceed with the state prosecution and therein to vindicate appellant's constitutional rights.

Such limited declaratory relief does not have the force of an injunction, Younger v. Harris, or a declaratory judgment couched in such terms as would have "virtually the same practical impact as a formal injunction would." Samuels v. Mackell, 401 U.S. 66, 72, 91 S. Ct. 764, 768, 27 L.Ed.2d 688 (1971). The use of the declaratory judgment here fits in precisely with the exception ar-

6. Pound, Mechanical Jurisprudence, 8 Colum.L.Rev. 605, 606 (1968).

ticulated by Mr. Justice Black in Samuels v. Mackell, 401 U.S. at 73, 91 S.Ct. at 768: "There may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive; in such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief."

We are quick to recognize that it may be contended that even such limited federal intervention in a state criminal proceeding would set an unwholesome precedent. Because of the high incidence of judicial fact-finding in pretrial hearings ancillary to state prosecutions, it can be envisioned that wholesale resort to this technique would be attempted. We are persuaded that any precedential value to our holding is miniscule. The factors which prompt our decision also limit its precedential value. First, perforce, the operative facts are limited to the State of New Jersey, where its constitution vests in the Chief Justice and the state's highest court the total and complete administrative control over judges of the trial level and appellate division. Second, this case alleged involvement by the Supreme Court with a municipal court judge, who allegedly was the target of state grand jury proceedings and who was summoned to appear before the Supreme Court minutes prior to a scheduled grand jury appearance. Third, it is alleged that prior to such appearance before the state's highest court, Helfant had resolved to invoke the Fifth Amendment before the grand jury

and that questioning by the Supreme Court appearance so unnerved him that he was unable to exercise a totally free will. Absent presence of these factors we see no future case receiving much precedential nourishment from the decision we reach today.[7]

Accordingly, the order dismissing the complaint will be reversed. The order denying the motion for a preliminary injunction will be vacated and the case will be remanded to the district court for the entry of an order temporarily enjoining the trial of Indictment No. SGJ–10–72–10 in the New Jersey courts until completion of the proceeding in the district court,[8] unless the State of New Jersey stipulates to a postponement thereof. The district court proceeding shall be limited to a determination of whether Helfant's testimony before the state grand jury on November 8, 1972, was the product of a free and unconstrained will. It shall issue a declaratory judgment setting forth its conclusions. We direct that the trial be commenced forthwith, and that the district court shall make findings of fact and conclusions of law within thirty days from the issuance of the mandate of this court. The mandate of this court shall issue forthwith.

ADAMS, Circuit Judge (dissenting).

The majority, while conceding that this case presents "a delicate question of federal-state comity," resolves that question by sanctioning federal interference in an ongoing state criminal proceeding. Warrant for this interference is purportedly found in the "extraordinary circumstances" exception to the anti-injunctive strictures of Younger v. Harris.[1]

---

7. There was some suggestion that this court should construe the New Jersey public employee immunity statute, N.J.S.A. 2A:81–17.-2a2 in the context of Helfant's grand jury appearance. The litigants agree that this statute is not applicable since Helfant's presence before the grand jury was not associated with his role as a municipal court judge, but as a private attorney.

8. "A court of the United States may . . . grant an injunction to stay pro-

ceedings in a State court . . . where necessary in aid of its jurisdiction . . . ." 28 U.S.C. § 2283.

1. The term "anti-injunctive" is, of course, shorthand for the notion that any federal interference in ongoing state criminal proceedings, be it by injunction, declaratory judgment, or otherwise, is to be disfavored. See Samuels v. Mackell, 402 U.S. 66, 91 S.Ct. 764, 27 L.Ed. 688 (1971).

I conclude that this case, unusual as its facts may be, provides no occasion for casting aside the interwoven precepts of federalism and equitable jurisdiction that combine to make up the *Younger* doctrine of non-intrusion. Accordingly, I dissent.

The majority's exposition of the rule of *Younger* is fair: a federal court may not interfere in an ongoing state criminal proceeding [2] absent a showing of prosecutorial bad faith or harassment, or other "extraordinary circumstances." It is conceded that neither bad faith nor harassment are present in Helfant's prosecution.[3] Rather, the majority holds that the alleged involvement of the New Jersey Supreme Court in Helfant's prosecution embodies an "extraordinary" situation.

What the majority appears to overlook is that *Younger,* while setting out a nucleus of rules, did more. It expressed a spirit. Though some of the historical antecedents of the *Younger* decision undoubtedly extend further,[4] the first formal expression of the *Younger* spirit in federal law came in 1793, when Congress imposed an absolute ban on federal injunctions issued "to stay proceedings in any court of a state."[5] Two apparent motives behind the statutory inhibition of the 1793 Act were to prevent encroachments by federal courts upon the then well-established state-court domain, and to codify the prevailing prejudices against extensions of equity jurisdiction and power.[6] One hundred and fifty years later the theme was repeated in Oklahoma Packing Co. v. Oklahoma Gas & Electric Co.[7] There the anti-injunction statute was viewed as necessary, in part, to "prevent needless friction between state and federal courts."[8] And only this term the Supreme Court reiterated its sensitivity "to principles of equity, comity, and federalism."[9]

Of course, the Supreme Court has recently acknowledged that section 1983, under which Helfant's suit has been brought, is a specific exception to the absolute interdiction of the anti-injunction statute.[10] Nonetheless, section 2283 expresses a "long standing public policy"[11] against federal interference in state proceedings. The emanations from that policy must thus be heeded even in a 1983 suit.[11a] Accordingly, the same considerations that underlay the 1793 Act and its successors—a respect for

2. *Compare* Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (Mar. 19, 1974).

3. "Bad faith" and "harassment" signify, generally, that a prosecution is being brought or threatened with no reasonable hope or expectation of obtaining a valid conviction. *See* Perez v. Ledesma, 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971).

4. For example, the conflict between law and equity, particularly as embodied in the practice of equity of enjoining proceedings at law, extends back at least into the seventeenth century. *See* O. Fiss, Injunctions 12 (1972). Justice Frankfurter, speaking more particularly, stated "[t]he maxim that equity will not enjoin a criminal prosecution summarizes centuries of weighty experience in Anglo-American law." Stefanelli v. Minard, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951).

5. 1 Stat. 335, the forebear of 28 U.S.C. § 2283. *See* Note, Anti-Suit Injunctions Between State and Federal Courts, 32 U.Chi. L.Rev. 471, 480 (1965). The statutory ban is today subject to several clearly delineated exceptions. *See* Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

6. *See* C. Warren, Federal and State Court Interference, 43 Harv.L.Rev. 345, 347 (1930); Toucey v. N.Y. Life Ins. Co., 314 U.S. 118, 131, 62 S.Ct. 139, 86 L.Ed. 100 (1941).

7. 309 U.S. 4, 60 S.Ct. 215, 84 L.Ed. 447 (1940).

8. *Id.* at 9, 60 S.Ct. at 218.

9. Steffel v. Thompson, *supra.*

10. *See* Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

11. Younger v. Harris, 401 U.S. 37, 43, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Mitchum v. Foster, *supra,* 407 U.S. at 230, 92 S.Ct. 2151.

11a. *See* O'Shea v. Littleton, 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Mitchum v. Foster, *supra,* 407 U.S. at 243, 92 S.Ct. 2151.

state sovereignty and "basic doctrine[s] of equity" which "restrain . . . equity jurisdiction within narrow limits" [12]—have been imported into our civil rights jurisprudence.

The prime vehicle of this importation is Younger v. Harris.[13] Supplemented by Samuels v. Mackell, *supra*, the *Younger* doctrine makes it clear that *only* prosecutorial bad faith or harassment, or "perhaps other extraordinary circumstances" [14] will justify federal intrusion, by way of injunction, declaratory relief or, as here, "federal fact-finding," into a state criminal proceeding. The doctrine is not hortatory. Given the policies incarnate in the *Younger* rule, it would appear that we should sanction interference under the "extraordinary circumstances" exception only when absolutely satisfied that neither "comity" nor equitable principles of restraint will suffer. Analysis of Helfant's situation leaves me far from satisfied that such is the case here.

### A. "Comity"

The concept of comity, though often invoked, tends to elude precise definition. Webster's dictionary offers a generic meaning—"mutual consideration between . . . equals." In the context of federal-state judicial relations, the meaning is more sharply etched. "Comity" is

> "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the

States and their institutions are left free to perform their separate functions in their separate ways." [15]

Among the "state functions" of which a federal court should be particularly respectful is the administration of state criminal justice.[16] The recognition that administration of the criminal law is "intimately involved with sovereign prerogative" [17] should result in an extreme diffidence on the part of a federal court asked to intrude into the state criminal process. Diffidence may be dispelled where, as in cases of "bad faith" or "harassment," the criminal law is being utilized for other than its ordinary, legitimate purpose, or where the state is acting in flagrant disregard of the orderly processes of criminal justice. But when, as here, a criminal prosecution has been brought with the hope of obtaining a valid conviction, "comity" dictates that the federal courts indulge every presumption in favor of the state court's impartiality, orderliness and competence to decide federal questions.

While avowing its recognition of this notion of respect for state functions, the majority concludes that the presumption in favor of the state criminal justice system is punctured and deflated by the circumstances of this case. The majority's view distills to this: because the New Jersey Supreme Court exercises rather plenary "administrative power" over the lower state courts, and because certain of the Justices of the New Jersey Supreme Court itself were the alleged instrument of Helfant's "coercion," there is likelihood of partiality on the part of the state trial court that would, ordinarily, resolve the factual

---

12. Younger v. Harris, *supra*, 401 U.S. at 43, 44, 91 S.Ct. at 750.

13. It must be noted that the Supreme Court, in *Younger*, emphasized that the anti-intrusive spirit adumbrated there was not a departure from the Court's prior decisions. *See, e. g.*, Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926) ; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943) ; Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L. Ed.2d 22 (1965).

14. Perez v. Ledesma, 401 U.S. 82, 85, 91 S. Ct. 674, 27 L.Ed.2d 701 (1971).

15. Younger v. Harris, *supra*, 401 U.S. at 44, 91 S.Ct. at 750.

16. *See* Railroad Comm'n v. Pullman, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See also* Aldisert, Judicial Expansion of Federal Jurisdiction, 1973 Ariz.St.U.L.J. 557, 572 (1973).

17. Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 30, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959).

questions embodied in Helfant's Fifth Amendment claim.[18]

The erection and entertainment by this Court of the foregoing scenario, and its use as a justification for interfering in a state criminal proceeding, appears to me to be squarely in the teeth of the spirit of comity expressed in *Younger*. The scenario presumes, for example, that the state trial judges act with a constant eye on the New Jersey Supreme Court, seeking not to apply the law fairly but to preserve or advance their own interests by a devious, obsequious sycophancy. It seems to postulate, further, that the New Jersey Supreme Court itself might be so venal and vindictive as to mete out some administrative "punishment" in the event that a trial court determined that Helfant had been "coerced." Finally, the majority's view overlooks what is the case in the federal system as well as in the states—that courts are sometimes asked to resolve controversies in which a party holds some power to affect adversely the very judges who are deciding the dispute.[19] In such instances, there is not imputed to the federal courts a hint of partiality. "Mutual respect among equals"—the generic definition of "comity"—would seem to demand, then, that no such imputation be made concerning the state courts either.

The majority, perhaps in recognition of the harsh light in which their decision might seem to cast the New Jersey courts, try to meliorate the implications of their opinion by speaking in terms of the mere "appearance" of a less than impartial state court process.

In sum, the majority's assertion that the possible "appearance of a biased [state] decision" warrants federal intrusion smacks of the federal high-handedness that section 2283 and *Younger* were fashioned to prevent. In my view, the spirit of comity, properly conceived and applied, would be reason enough to reject Helfant's plea for federal relief at this stage of the controversy.[20]

## B. "Great and Immediate" Harm

A crucial aspect of *Younger's* limitation upon incursions into state proceedings is the concept that federal interference may be sanctioned, if at all, only when the alleged unconstitutional harm will be "both great and immediate."[21] This teaching has its genealogy in traditional precepts of equitable restraint.[22] A consideration of the facts of the present dispute shows that, even were it the case that Helfant had been "coerced" into testifying, any harm resulting from

18. Of the Justices that were on the New Jersey State Supreme Court at the time of the incident referred to in Helfant's complaint, only four remain as members of the Court, and more specifically the Chief Justice, who exercises the administrative supervision referred to in the majority opinion, has since retired.

19. To cite an obvious example, federal courts quite often assess the constitutional validity of Congressional legislation. Congressmen, of course, may grant or withhold a salary increase to federal judges at any time. There thus exists something of an economic motivation for a federal judge to be less than impartial in reviewing federal legislation. Yet I do not think the probity of a federal court decision may be properly questioned on such bases.

20. Only recently, a three-judge federal district court sitting in New Jersey rejected the notion that the New Jersey state courts are incapable of fairly adjudicating issues implicating their own state Supreme Court. In American Trial Lawyers Ass'n v. New Jersey Supreme Court, No. 64–72 (D.N.J., June 20, 1972), where there was attacked by a bar association a rule promulgated by the New Jersey Supreme Court setting forth the ground rules for contingent fees, the district court in rejecting the complaint stated:

"Rather [plaintiffs] emphasize that by leaving [their claims] to the state courts they ultimately must have their cause decided by the same body which took the action they attack. Admittedly, this is so. Nevertheless, we cannot conclude that the state courts will listen with deaf ears to plaintiffs' challenge simply because plaintiffs attack the rulemaking authority of the State Supreme Court."

21. Younger v. Harris, *supra*, 401 U.S. at 46, 91 S.Ct. 746; Fenner v. Boykin, *supra*, 271 U.S. at 243, 46 S.Ct. 492.

22. Fletcher v. Bealey, 28 Ch. 688 (1885). *See* Story, Equity Jurisprudence 377 (1919).

that coercion would not be "immediate" —a *sine qua non* of federal relief.

The majority, having correctly determined that there is no basis in law for an outright injunction against Helfant's prosecution, concludes that if the facts are as Helfant alleges, declaratory relief should issue to the effect that the "coerced" testimony may not be introduced at Helfant's trial. The edict thus fashioned by the majority is bottomed on what is, at best, mere speculation that the state will in fact attempt to introduce against Helfant the testimony elicited from him at the grand jury hearing. At oral argument, counsel for the state represented to this Court that Helfant's grand jury testimony will be used, if ever, *only* to impeach any inconsistent statements Helfant might utter should he take the witness stand.[23] The "harm" that the majority's decision seeks to avert is thus conjectural, depending for its very existence upon events that may never occur. Consequently, the majority's result tends to ignore or flout the "great and immediate" requirement.

Another point should be mentioned briefly here. Helfant was indicted for three "substantive" offenses,[24] as well as for false swearing before the grand jury. Insofar as the false swearing counts are concerned, it would appear that Helfant's grand jury testimony will be admissible in evidence in any event, even if it should be determined that that testimony was "coerced." The Supreme Court, and this Court as well, have held that the Fifth Amendment does not confer upon a witness the privilege to lie while under oath.[25] Thus, though "coerced" testimony may not be used to establish Helfant's commission of "substantive" offenses, it would appear that the state may use it to prove that he swore falsely.

The majority's disregard of the "great and immediate" limitation thus emerges in sharp focus. There is no reasonable assurance that Helfant's grand jury utterances will *ever* be introduced at trial of the substantive counts, and there is a positive indication that Helfant can suffer no unconstitutional harm at all by introduction of his testimony at trial of the false swearing counts. The equitable doctrine that harm must be imminent before an injunction will issue against a state criminal proceeding—a precept whose substance is an integral part of the doctrine of federal nonintrusion—is, therefore, disregarded by the result the majority reaches.[25a]

C. "Irreparable Injury" and "Adequate Remedy at Law"

Among the central limiting principles of equity jurisprudence is the maxim

23. The colloquy at oral argument between the Court and counsel for New Jersey was as follows:
Judge Aldisert: Is the state representing to this federal court that it does not intend to and will not use the testimony elicited from the plaintiff at the grand jury proceeding?
A. At this time there is no present intention of using that testimony. But were the appellant to take the stand, were his testimony to deviate in strong terms, that testimony then, of course, under Harris v. New York, might well be . . . . .
Judge Aldisert: . . . [N]ow we do not have as strong a position that I thought we had a minute ago.
   *    *    *    *    *
Judge Aldisert: The question now comes if the plaintiff is not entitled to federal court protection of an asserted constitutional right at this time, at what time could he possibly have federal protection if an issue at stake is the possible bias of a state court system?
A. Were the state to seek to introduce the grand jury testimony as a declaration against penal interests, for the purpose of argument, perhaps the appellant might have standing to come into this Court.

24. The three "substantive" state offenses with which Helfant is charged are conspiracy, obstructing justice, and aiding in the compounding of a crime.

25. *See* United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); Glickstein v. United States, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1911); United States v. Hockenberry, 474 F.2d 247 (3d Cir. 1973). *See also* United States ex rel. Annuziato v. Deegan, 440 F.2d 304 (2d Cir. 1971).

25a. *See* O'Shea v. Littleton, *supra*, 414 U.S. at 498, 94 S.Ct. 669.

that equity will act only when there is no adequate remedy at law.[26] This notion, too, has its roots in the historical bifurcation—and the resultant conflict—between courts of law and of equity.[27] The requirement that a plaintiff show "irreparable injury" before an injunction will issue is but an alternative statement of the "adequate remedy" rule.

*Younger* emphasizes that the "adequate remedy" rule is to be given rigorous application when a federal court is asked to interfere in an ongoing state criminal proceeding. Mere allegations of unconstitutionality will ordinarily not suffice to justify intrusion into a state criminal trial:

> "Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves, be considered 'irreparable' in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." [28]

Even prior to *Younger* the Supreme Court had explained, in forceful language, why challenges to certain types of unconstitutionality would not ordinarily support federal interruption of a state criminal trial. First, the state criminal process is presumed to be an "adequate" channel for vindicating federal rights. Second, if federal relief were granted in the midst of a state criminal proceeding,

"[e]very question of procedural due process of law—with its far flung and undefined range—would invite a flanking movement against the system of State courts by resort to the federal forum . . . to determine the issue. Asserted unconstitutionality in the impanelling and selection of the grand and petit juries, in the failure to appoint counsel, in the admission of a confession, in the creation of an unfair trial atmosphere, in the misconduct of the trial court—all would provide ready opportunities . . . to subvert the orderly, effective prosecution of local crime in local courts." [29]

This exposition by the Supreme Court of the underpinnings of the adequate remedy doctrine makes plain that, besides honoring tenets of equitable restraint, the adequate remedy rule advances and protects the concept of federal-state comity. The requirement that there be no adequate remedy at law is thus strengthened by *Younger's* explicit and implicit re-invigoration of "a proper respect for state functions." [30]

The sanctioning of federal relief at this stage of Helfant's prosecution practically undermines the "adequate remedy" precept. What Helfant seeks, and what the majority would permit, is a federal declaration in the middle of a state criminal trial to the effect that certain evidence was unconstitutionally obtained, and so is inadmissible in the state court. To my mind, this situation so closely resembles that adverted to in *Stefanelli, supra,* that there is little justification for denominating this an "extraordinary situation" and shelving the

26. O. Fiss, Injunctions 9 (1973).

27. *Id.* at 12. *Cf.* Story, Equity Jurisprudence 375–80 (1919).

28. Younger v. Harris, *supra,* 401 U.S. at 46, 91 S.Ct. at 751; *see also* Watson v. Buck, 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

29. Stefanelli v. Minard, 342 U.S. 117, 123–124, 72 S.Ct. 118, 122 (1951) (footnotes omitted); *see also* Cleary v. Bolger, 371 U.S. 392, 397, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963).

30. 401 U.S. at 44, 91 S.Ct. at 750. It is significant to note that Justice Brennan, writing for the majority in Dombrowski v. Pfister, *supra,* 385 U.S. at 485 n. 3, 85 S.Ct. at 1120, adverted to a situation closely analogous to that presented in this case. He said:

> "It is difficult to think of a case in which an accused could properly bring a state prosecution to a halt while a federal court decides his claim that certain evidence is rendered inadmissible by the Fourteenth Amendment."

restraints on our remedial powers. A criminal prosecution, followed by appeal and petition for certiorari, is presumed to be an adequate remedy for the constitutional deficiencies Helfant alleges. The "inadequacy" the majority perceives is, of course, the asserted involvement of the New Jersey Supreme Court. However, as we have seen, that very claim of "inadequacy" is itself in derogation of the program of comity.

Moreover, there is an alternative federal remedy available to Helfant if the need for it should ever arise, a remedy which would provide an opportunity for the sort of "federal fact finding" adverted to by the majority. Yet, this alternative remedy—habeas corpus—would not cause so severe a wrench to federal-state relations as the one advanced by the majority. Should Helfant lose his Fifth Amendment claims in the state courts and receive a custodial sentence,[31] he may seek a writ of habeas corpus. The habeas statute would appear to require full federal fact finding on Helfant's "coercion" claim,[32] given the circumstances Helfant alleges.

Again, the dominant chord of *Younger,* requiring as it does that we pay scrupulous heed to the adequacy of state remedies and alternative federal remedies, appears to have been abridged by the majority's decision. And certainly, when the "adequate remedy" rule, the requirement of "great and immediate" harm, and the cardinal principle of comity are considered together, the sanction-

ing of federal interference in this case cannot be justified.

### D. "Extraordinary Circumstances"

The assumption that there exists an "extraordinary circumstance" exception to *Younger's* interdiction is grounded in the language of the *Younger* opinion itself. There, the Supreme Court said:

"There *may,* of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." [33]

But the Court immediately proceeded to point to an illustration of what such circumstances might be, quoting from Watson v. Buck: [34]

"It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." [35]

No other delineation of the contours of the "extraordinary circumstances" exception has yet been undertaken by the Supreme Court. Indeed, scattered statements by the Court seem to indicate doubt on the part of some of the Justices that any such exception exists at all. Thus in Perez v. Ledesma,[36] for example, decided on the same day as *Younger,* Justice Black was willing to say only that *"perhaps* in . . . extraordinary circumstances where irreparable

---

31. *See* 28 U.S.C. § 2254; United States ex rel. Dessus v. Pennsylvania, 452 F.2d 557 (3d Cir. 1971), cert. denied, 409 U.S. 853, 93 S.Ct. 184, 34 L.Ed.2d 96 (1972).

32. 28 U.S.C. § 2254(d) provides in part that in federal district courts, upon an application for *habeas,* prior state-court findings of fact "shall be presumed to be correct" unless:

"(2) . . . the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing; or

"(6) . . . the applicant did not receive a full, fair, and adequate hearing in the state court proceeding; or

"(7) . . . the applicant was otherwise denied due process of law in the State court proceeding."

If Helfant is convicted by use of improperly procured evidence, his conviction thus could be set aside by such a finding by a federal district court.

33. 401 U.S. at 53, 91 S.Ct. at 755 (emphasis added).

34. 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

35. *Id.* at 402, 61 S.Ct. at 967.

36. 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971).

injury can be shown is federal . . . relief against pending state prosecutions appropriate." [37] And only recently, in Allee v. Medrano,[38] Chief Justice Burger, joined by two other members of the Court, offered a reading of *Younger* that seems to leave no room for any extraordinary circumstances exception:

> "To meet the Younger test the federal plaintiff *must* show manifest bad faith and injury that is great, immediate, and irreparable, constituting harassment of the plaintiff in the exercise of his constitutional rights, and resulting in a deprivation of meaningful access to the state courts." [39]

While it cannot be said that these statements affirmatively establish that there is no "extraordinary circumstances" exception, they do indicate that uncertainty exists concerning what circumstances, if any, will warrant federal intrusion under that circumscribed exception. Absent a clear benchmark to guide us in identifying "extraordinary circumstances," we should hew closely to the concepts of equitable restraint and comity, concepts which, after all, *Younger* was designed to preserve, protect and perpetuate.

## E. Practical Considerations

Thus far, I have sought to point out how historical and doctrinal considerations weigh against a federal incursion into the midst of Helfant's state prosecution. But more is called for in this case than "a merely doctrinaire alertness to protect the proper sphere of the States in enforcing their criminal law." [40] A glance at pragmatics and at the realities of time and cost emphasize how damaging to federal-state relations the majority's decision may prove.

Helfant was first subpoenaed to appear before the state grand jury in October of 1972. On January 17, 1973, an indictment was returned, charging Helfant with the commission of crimes that occurred as early as 1968. It has now been more than a year-and-a-half since New Jersey has been thwarted from proceeding with the prosecution because of the federal intervention sought by Helfant. During that time, a critical witness has died and the administration of the prosecutor's office has changed. The prospect now is for further delay, since "fact finding" has been ordered in the district court, and because there is the possibility of another appeal to this Court from the fact finding proceeding. It is, therefore, not unlikely that a two-year suspension in the state prosecution will result. A delay of such duration in a state criminal proceeding, sanctioned by a federal court, and predicated solely on a challenge to the admissibility of evidence—evidence that may never be offered—would certainly seem to be an "insupportable disruption." [41] This is particularly true in these times when special efforts are being made to expedite criminal proceedings.[42]

Looming large among the doctrinal premises of *Younger,* of section 2283, and of the recent proliferation of commentary justifiably decrying the "denigration of state courts," [43] is the idea that, for our federal system to function as it ought, the states must be accorded a full measure of dignity, respect and confidence. When a federal court, on the occasion of a criminal defendant's objection to evidence, imposes a substantial impediment upon a state criminal trial, little is done to enhance the prestige of either court, state or federal.

37. *Id.* at 85, 91 S.Ct. at 677.

38. 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (May 20, 1974).

39. 416 U.S. at 836, 94 S.Ct. at 2210 (Burger, C. J., concurring and dissenting).

40. Stefanelli v. Minard, *supra,* 342 U.S. at 123, 72 S.Ct. at 123.

41. *Id.*

42. *See, e. g.,* Rule 50(b), Federal Rules of Criminal Procedure; ABA Project on Standards for Criminal Justice, Standards Relating to Speedy Trial (Approved Draft, 1968).

43. Aldisert, *supra,* at 573.

What is at stake in this case is the need to strike a balance between the regimen of non-intrusion on the one hand, and a citizen's right to federal disposition of his federal claims on the other. The two are not irreconcilable. Helfant, under the view expressed in this dissent, could have his day in federal court by certiorari or by habeas. And, of course, by declining to permit federal interference now we would save to the state its sovereign prerogative to try an accused without delay. The majority's solution of the problem, however, disrupts and disdains the state process for no other reason than to assure Helfant of an *immediate* federal forum for a factual claim that may never ripen into controversy. Comity thus suffers, not in the interest of preserving intact the right to be heard in federal court, but solely as a guarantee that that right be vindicated *instanter*.

For all of the reasons set forth, I dissent, and would affirm the judgment of the district court.

Judges VAN DUSEN and WEIS join in this dissenting opinion.