**STATE OF NEW JERSEY**

v.

**CHESIMARD, Joanne D., (a/k/a) Assata Shakur, Appellant.**

**No. 77–1104.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 25, 1977.

Reargued In Banc Feb. 18, 1977.

Decided March 9, 1977.

As Amended March 24 and 29, 1977.

**64**

William Kunstler, Lewis Meyers, Nat. Conference of Black Lawyers, New York City for appellant.

John W. Corwin Center for Constitutional Rights, New York City, Stephen M. Latimer, Rutgers University Law School Prison Law Clinic, Newark, N. J., Sa'ad El-Amin, World Community of Islam in the West, Chicago, Ill., Sanford M. Katz, Yasim Mosque, New York City, amici curiae in support of appellant.

C. Judson Hamlin, Middlesex County Prosecutor, William Welaj, Nicholas J. Stroumtsos, Jr., Asst. Prosecutors, New Brunswick, N. J., for appellee.

William F. Hyland, Atty. Gen. of N. J., Trenton, N. J., Daniel Louis Grossman Deputy Atty. Gen., Div. of Criminal Justice, Appellate Section, David S. Baime, John De Cicco, Deputy Attys. Gen., Princeton, N. J., amici curiae in support of appellee.

Before VAN DUSEN, MARIS and ADAMS, Circuit Judges.

Reargued in banc Feb. 18, 1977.

Before SEITZ, Chief Judge, and MARIS, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question for decision is whether the principles of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), as reiterated in *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), bar a federal court from prohibiting sessions on Friday, the Islamic Sabbath of appellant, in a pending criminal trial in state court when available state procedures to remedy the alleged constitutional infringement have not been exhausted. Joanne D. Chesimard, the appellant in this court and the defendant in the state criminal proceedings, is a Sunni or Orthodox Muslim who observes Jumah or Jumuah (Friday) as her weekly holy day. She asserts her First Amendment right to free exercise of religion as the basis of her request for federal injunctive or declaratory relief prohibiting state officials from conducting proceedings on Friday in her trial. The district court denied the requested relief. Acting on appellant's motion for a stay of the district court's order and on appellee's petition for summary affirmance, a panel of this court granted appellant declaratory relief on her First Amendment free exercise contention. The full court vacated the panel's order and granted rehearing in banc. After additional briefing and oral argument before the court in

banc, we grant appellee's motion for summary affirmance of the judgment of the district court.[1] We do so on the basis of *Huffman, supra*, 420 U.S. at 609, 95 S.Ct. at 1211 which requires "that *Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies."

## I.

Indicted in New Jersey on two counts of murder, one count of armed robbery, one count of illegal possession of a weapon, and four counts of assault on two police officers, Joanne Chesimard filed numerous pre-trial motions in the state trial court. Concentrating our attention on the First Amendment claim, the account of the New Jersey proceedings discloses that on April 12, 1976, Judge Theodore Appelby, of the Superior Court of New Jersey, denied appellant's motion to recess court on Fridays during the trial in order to permit her to observe her Muslim Sabbath. Ms. Chesimard moved for leave to appeal the adverse decision to the Superior Court, Appellate Division. The Appellate Division denied her request.

New Jersey court rules explicitly permit a litigant to seek leave to appeal to its Supreme Court from an interlocutory order of the Appellate Division, "when necessary to prevent irreparable injury." New Jersey Court Rule 2:2–2(b).[2] The essence of appellant's claim for federal injunctive or declaratory relief is that she will suffer irreparable injury. If this can be asserted in this court system, the same argument may be asserted in the New Jersey court system under N.J.Ct.R. 2:2–2(b) to obtain Supreme Court review of the Appellate Division's order. We therefore reject appellant's contention that by virtue of New

---

1. In her petition to the district court, Ms. Chesimard requested relief on three grounds: removal, pursuant to 28 U.S.C. § 1443 *et seq.*; habeas corpus, pursuant to 28 U.S.C. § 2254; and injunctive relief, pursuant to 42 U.S.C. § 1981 *et seq.* Faced with an inartfully drawn petition in which jurisdictional claims were made without reference to the specific acts leading to each category of requested relief, the district court addressed primarily the removal claim, disposing of the habeas corpus claim and the civil rights claim in footnotes.

    We affirm the denial of the petition for removal under 28 U.S.C. § 1443 as untimely filed. Title 28 U.S.C. § 1446(c) requires the removal petition to be filed at any time "before trial". Here the petition for removal was filed after two days of jury *voir dire* involving 64 prospective jurors. We agree with the Ninth Circuit that the phrase "before trial" must be construed to mean "before proceedings for empanelling a jury." *United States ex rel. Walker v. Gunn*, 511 F.2d 1024 (9th Cir.), *cert. denied*, 423 U.S. 849, (1975). *See also Chesimard v. Kuhlthau*, 370 F.Supp. 473, 475 (D.N.J.1974).

    It is unclear whether appellant predicates her free exercise claim upon her habeas corpus petition or her § 1981 *et seq.* request. In any event, we affirm the denial of habeas corpus relief under 28 U.S.C. § 2254 because appellant clearly failed to exhaust state remedies. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Moore v. De Young*, 515 F.2d 437, 443–47 (3d Cir. 1975). *See* N.J.Stat. Ann. 2A:67–1 *et seq.* (New Jersey state habeas corpus procedures).

    Finally, we also affirm the district court's refusal to grant relief against the conditions of Ms. Chesimard's confinement, as alleged in her petition. Although the district court was not restricted by *Younger* principles on this issue, *see Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), by the time the proceedings were filed in federal court, the state trial had already begun. Ms. Chesimard's attendance at trial necessarily alters the confined regimen asserted in her petition below, inasmuch as she will not be confined in her cell for at least four or five days a week. Under these circumstances, we will not disturb the ruling of the district court. Moreover, we note that a similar petition to relieve these same conditions was the subject of lengthy proceedings before Judge George H. Barlow in *Joanne Chesimard (Assata Shakur) v. Middlesex County Board of Chosen Freeholders et al.*, Civil Action No. 76–582. A 15-page opinion discussing the conditions was filed July 15, 1976.

2. N.J.Ct.R. 2:2–2 provides:

    Appeals may be taken to the Supreme Court by its leave from interlocutory orders:

    (a) Of trial courts in cases where the death penalty has been or may be imposed and in post-conviction proceedings in cases in which the death penalty was imposed.

    (b) Of the Appellate Division when necessary to prevent irreparable injury;

    (c) On certification by the Supreme Court to the Appellate Division pursuant to R. 2:12.

Jersey Court Rule 2:2–5[3] she had "no recourse whatsoever to the Supreme Court". Appellant's Supporting Memorandum at 4. We are instructed by the New Jersey Attorney General that "[e]ven at this late stage of the proceeding, the New Jersey Supreme Court may entertain a motion to proceed *nunc pro tunc.*" Amicus Curiae Brief of New Jersey Attorney General at 5. The Attorney General argues that although there is generally a 15–day time limit on the filing of interlocutory appeals, *see* New Jersey Court Rules 2:4–1(c)[4] and 2:5–6(a),[5] any rule of court may be relaxed in the interest of justice under New Jersey Court Rule 1:1–2.[6]

Given the nature of Ms. Chesimard's important and sensitive claim, we cannot characterize it as frivolous nor can we assume that the New Jersey Supreme Court would ignore it. The New Jersey Supreme Court is a distinguished tribunal which has been most solicitous of the First Amendment rights of members of the Muslim faith. For example, in *Holden v. Board of Education of City of Elizabeth*, 46 N.J. 281, 216 A.2d 387 (1966), the court held that Muslim school children who, for religious reasons, refuse to pledge allegiance to the American flag cannot be excluded from New Jersey's schools. The Court there recognized "a reli-gion known as Islam [whose members] are taught that their sole allegiance is to Almighty God Allah. . . . Their religious teachings are based on the Quran, as interpreted to them by one Elijah Muhammad, whom they regarded as their leader and spiritual prophet." 216 A.2d at 389. Particularly in light of *Holden,* we cannot assume that the New Jersey Supreme Court would be unwilling to give appellant's important First Amendment claim priority consideration similar to that afforded by this court.[7]

## II.

The centerpiece of the *Younger* principle is the requirement that one seeking federal intervention in a pending criminal proceeding must show not merely the irreparable injury which is a normal prerequisite for an injunction, but also that the injury would be "great and immediate": "The threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." 401 U.S. at 46, 91 S.Ct. at 751. The claim is made here that Ms. Chesimard's free exercise right could not be asserted as a defense to the criminal prosecution. But it is equally true that the right could not be raised in the absence of a

3. N.J.Ct.R. 2:2–5 provides:

   A judgment of the Appellate Division on an appeal to it from an interlocutory order, decision or action shall be deemed to be interlocutory and not appealable to the Supreme Court as a final judgment, unless the judgment of the Appellate Division is dispositive of the action.

4. N.J.Ct.R. 2:4–1 provides:

       .     .     .     .     .

   (c) Applications for leave to appeal from interlocutory orders, decisions or actions shall be made within the time provided by R. 2:5–6(a).

5. N.J.Ct.R. 2:5–6 provides:

   (a) *Appeals.* Applications for leave to appeal from interlocutory orders of courts or of judges sitting as statutory agents and from interlocutory decisions or actions of state administrative agencies or officers shall be made by serving and filing with the appellate court a notice of motion for leave to appeal, as prescribed by R. 2:8–1, within 15 days after entry of such order or the date of ser-vice of such administrative decision or notice of such administrative action.

6. N.J.Ct.R. 1:1–2 provides:

   The rules in Part I through Part VII, inclusive, shall be construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay. Unless otherwise stated, any rule may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice. In the absence of rule, the court may proceed in any manner compatible with these purposes.

7. One day after the district court entered its final order of January 20, 1977, a single judge of this court entertained, but did not grant, a motion for temporary relief; a panel then was assembled on an emergency basis to hear oral argument on January 25; subsequent to the panel's action and, again, on an emergency basis, the full court summoned ten circuit judges from three states for the sole purpose of hearing oral argument in banc on February 18.

criminal prosecution and that it has, in fact, been asserted as part of an ongoing criminal prosecution. Ms. Chesimard raised her free exercise claim by pre-trial motion in the state court. Although the state system provides for interlocutory review of the adverse ruling she received, Ms. Chesimard has chosen not to pursue her available state remedies to their fullest extent. Under these circumstances, we believe the federal hand must be stayed. Like the *Huffman* Court, "we do not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State appellate courts." *Huffman v. Pursue, Ltd., supra,* 420 U.S. at 609, 95 S.Ct. at 1211. Whether federal intervention would be justified in the absence of state procedures for interlocutory review, or upon affirmance by the state Supreme Court, is a question we need not decide because *Huffman* makes clear that irreparable injury cannot exist when available state procedures have not been exhausted.

Nor does the withholding of federal relief under these circumstances do violence to the traditional notion that exhaustion of state judicial remedies is ordinarily not a prerequisite to relief sought under 42 U.S.C. § 1983, as it is to relief sought under 28 U.S.C. § 2254, *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). "By requiring exhaustion of state appellate remedies for the purposes of applying *Younger,* we in no way undermine *Monroe v. Pape,* 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1967). There we held that one seeking redress under 42 U.S.C. § 1983 for a deprivation of federal rights need not first initiate state proceedings based on related state causes of action. 365 U.S. at 183 [81 S.Ct. at 482]. *Monroe v. Pape* had nothing to do with the problem presently before us, that of the deference to be accorded to state proceedings which already have been initiated and which afford a competent tribunal for the resolution of federal issues." *Huffman v. Pursue, Ltd. supra,* 420 U.S. at 609 n. 21, 95 S.Ct. at 1211.

## III.

Although we affirm the district court on *Younger* principles because we find that Ms. Chesimard has not exhausted her state appellate remedies, it is necessary to discuss briefly the contention that *Younger* is not applicable to this case because of the peculiar nature of the relief sought. It is contended that the request for Friday recesses is a collateral matter, not related to the central guilt-determination process, and that such collateral matters are not within the *Younger* rationale. While we recognize this distinction, suggested in *Conover v. Montemuro,* 477 F.2d 1073, 1082 (3d Cir. 1973), and noted in *Gerstein v. Pugh,* 420 U.S. 103, 108 n. 9, 95 S.Ct. 854, 860, 43 L.Ed.2d 54 (1975), we are not persuaded that it commands a different result in the present posture of this case. The *Gerstein* Court's entire discussion of the point was as follows:

> The District Court correctly held that respondent's claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions. *Younger v. Harris,* 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971). The injunction was not directed at the state prosecution as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits. *See Conover v. Montemuro,* 477 F.2d 1073, 1082 (3d Cir. 1972); *cf., Perez v. Ledesma,* 401 U.S. 82 [91 S.Ct. 674, 27 L.Ed.2d 701] (1971); *Stefanelli v. Minard,* 342 U.S. 117 [72 S.Ct. 118, 96 L.Ed. 138] (1951).

*Ibid.*

*Conover,* like *Gerstein,* did not involve the guilt-determination process; it concerned the right to a preliminary hearing prior to the filing of charges in a juvenile case. Federal action in *Conover* did not affect the adjudication of the merits of any charge. Indeed, *Conover* placed express precedential reliance on *Lewis v. Kugler,* 446 F.2d 1343

(3d Cir. 1971), and recognized the narrow compass of that decision:

> Even if a state prosecution is pending, injunctive or declaratory relief against state officers with respect to violations of federal constitutional rights not amounting to an injunction *which will halt or substantially interfere with a pending prosecution* may still be available. *Lewis v. Kugler, supra* at 1349.

*Conover v. Montemuro, supra,* 477 F.2d at 1080 (emphasis added).

■ The issue raised under the *Gerstein* formulation is whether the federal order sought would "prejudice the conduct of the trial on the merits." 420 U.S. at 108, n. 9, 95 S.Ct. at 860. Or, as stated by this court in *Conover,* the question is whether the federal order will "substantially interfere with a pending prosecution." 477 F.2d at 1080. Persuasive arguments can be made on either side of the question whether an order that requires that a pending state trial not be conducted on Fridays creates a sufficient degree of interference with the "conduct of the trial on the merits" to require application of *Younger* principles. But it cannot be gainsaid that, even if the order would not substantially interfere with the conduct of the trial, to permit federal intervention here when state interlocutory appellate review remains available would unnecessarily displace the state's supreme court of its role in supervising the conduct of trials in state courts. Unlike the situation in *Conover,* in which the order sought did not have reference to any particular trial court ruling in an ongoing proceeding, intervention here would deprive the New Jersey Supreme Court of an opportunity to review a discrete judicial ruling in a pending trial.

Accordingly, we conclude that *Younger* is applicable in the present posture of the case and need not consider its applicability to the situation in which state appellate review is unavailable or completed.

1. 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

Moreover, the fact that the relief sought here can be characterized as collateral to the central fact-finding and guilt determination process does not necessarily remove it from *Younger's* reach. *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975), vacating and remanding 500 F.2d 1188 (3d Cir. 1974) (in banc), reminded this court that even collateral issues may substantially interfere with the conduct of the trial on the merits, requiring application of the principles of equity and comity which underlie *Younger*: "If the federal equity power must refrain from staying State prosecutions outright to try the central question of the validity of the statute on which the prosecution is based, how much more reluctant must it be to intervene piecemeal to try collateral issues." *Ibid.,* 421 U.S. at 130, 95 S.Ct. at 1533, *quoting Stefanelli v. Minard,* 342 U.S. 117, 123, 72 S.Ct. 118, 96 L.Ed. 138 (1951).

### IV.

■ Finally, the Supreme Court has crisply answered the contention that although *Younger* precludes injunctive relief, federal declaratory relief is nevertheless available: "[T]he basic policy against federal interference with pending state prosecutions would be frustrated as much by the declaratory judgment procedure ordered by the Court of Appeals as it would be by the permanent injunction originally sought by [petitioner]." *Kugler v. Helfant, supra,* 421 U.S. at 131, 95 S.Ct. at 1534, *citing Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

Appellee's motion for summary affirmance is granted and the judgment of the district court will be affirmed. The mandate of the court will issue forthwith.

ADAMS, Circuit Judge, dissenting in part.

I respectfully dissent from the Court's disposition of the *Younger v. Harris* [1] issue. [2]

2. I agree with the majority's analysis of the other issues. *See* Majority opinion at n. 1.

My grounds for disagreement with the majority are two-fold. First, I believe that *Younger* is not applicable in the situation before us, but rather that federal remedial relief is available under the principle of *Gerstein v. Pugh.*[3] Second, even if it were to be decided that this case does not fit within the *Pugh* guidelines but instead falls within the general ambit of *Younger,* I would conclude that we are presented here with one of the "exceptional" cases referred to in the latter formulation where federal intervention is nonetheless permissible.

## I.

In recognition of the perception that "a federal lawsuit to stop a prosecution in a state court is a serious matter,"[4] the Supreme Court in *Younger v. Harris*[5] and its progeny[6] has enunciated a regime of comity between federal and state judicial processes, that has deep roots in American jurisprudence.[7] *Younger* declares that a federal court may not interfere in an ongoing state criminal proceeding absent a showing of prosecutorial bad faith or harassment or other extraordinary circumstances.[8] And even in those instances where the initial predicate for federal intervention has been made out, a federal court must still stay its hand unless the party seeking relief can demonstrate that without a federal equitable remedy he will suffer harm that is both great and immediate and has no adequate remedy at law.[9]

The principles set forth in *Younger* are most salutary. *Younger* calls upon us ungrudgingly to show "a proper respect for state functions," and to recognize that in our federal system state courts as well as federal courts have a solemn obligation to preserve the constitutional rights of the citizenry.[10] Moreover, because the administration of the criminal process is one of the core functions of the states and since constitutional rights may normally be vindicated in the ordinary course of an unfolding prosecution, we should exhibit considerable reticence when requested to intrude in a state criminal trial.[11]

## II.

That *Younger* is an important ingredient in the preservation of the frictionless operation of our federal system does not at all answer the question whether its strictures apply to the factual setting that is presented to us. In my opinion, it would appear that they do not.

**3.** 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

**4.** 401 U.S. at 42, 91 S.Ct. at 749.

**5.** 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* was one of six cases disposed of simultaneously by the Supreme Court. *See also Byrne v. Karalexis,* 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971); *Dyson v. Stein,* 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); *Boyle v. Landry,* 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

**6.** *See, e. g., Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

**7.** *See Helfant v. Kugler,* 500 F.2d 1188, 1199–1200 (3d Cir. 1974) (en banc) (Adams, J., dissenting), *rev'd* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975).

**8.** 401 U.S. at 46–50, 53, 91 S.Ct. 746. *See also Kugler v. Helfant,* 421 U.S. 117, 123–25, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975).

**9.** 401 U.S. at 45–46, 91 S.Ct. 746.

**10.** *Id.* 401 U.S. at 44, 91 S.Ct. 746.

**11.** Judge Gibbons' opinion appears to state that the importance of *Younger* lies in its establishment of a relationship "between the national law and state enforcement of its own law." Opinion of Gibbons, J., at 80. It goes on to indicate, however, that imposition of federal standards upon the state criminal process at any point could be viewed as an intrusion on the states for purposes of *Younger.* Opinion of Gibbons, J., at 80. I am concerned that the logical implications of this approach, might well undermine the underlying premises of the *Younger* rule.

The linchpin of *Younger*, as I see it, is its disapprobation of federal court action that "imposes a substantial impediment upon a state criminal trial,"[12] a concept usually described as federal "interference" or "intrusion." The most basic type of action that *Younger* inveighs against is the halting of an ongoing state prosecution.[13] This, however, does not fully describe the full reach of the *Younger* doctrine. Interference with certain component aspects of state criminal trials have been found to be equally offensive to basic notions of comity. Thus, cases such as *Kugler v. Helfant*[14] and *Stefanelli v. Minard*[15] have made clear that, in the usual situation, federal courts should not supplant state judicial processes in determining whether certain evidence can constitutionally be admitted at a state criminal trial.[16]

These admonitions, however, do not encompass all federal court actions that have the possibility of touching upon a state criminal prosecution. The Supreme Court has indicated that, in some cases, certain federal equitable decrees may issue even though they may affect the operation of the state criminal processes.

An example of this can be found in *Gerstein v. Pugh*.[17] *Pugh* was a federal class action brought by persons arrested for felonies. They sought a ruling that the State of Florida was constitutionally required to provide them with an expeditious hearing on the question of probable cause for arrest and an appropriate remedy to rectify this deprivation. The district court granted relief, and the Fifth Circuit and the Supreme Court affirmed. In the lower courts, the state had urged that the issuance of equitable relief in favor of the plaintiff class would transgress the teachings of *Younger*. The Supreme Court rejected this contention noting that:[18]

> The injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits.

A fuller statement of the rationale underpinning this position can be found in Judge Tuttle's carefully-crafted opinion for the Fifth Circuit in *Pugh*.[19] *Younger*, Judge

**12.** *See Helfant v. Kugler,* 500 F.2d 1188, 1205 (3d Cir. 1974) (en banc) (Adams, J., dissenting), *rev'd,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975); *Conover v. Montemuro,* 477 F.2d 1073, 1082 (3d Cir. 1973).

**13.** *See, e. g., Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (request for preliminary injunction); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (request for permanent injunction).

**14.** 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975).

**15.** 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951).

**16.** The scope of the Court's concern was indicated in *Stefanelli,* 342 U.S. at 123–24, 72 S.Ct. at 121:

> If we were to sanction this intervention, we would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law— with its far-flung and undefined range— would invite a flanking movement against the system of State courts by resort to the federal forum, with review, if need be to this Court, to determine the issue. Asserted un-

constitutionality in the impaneling and selection of the grand and petit juries, in the failure to appoint counsel, in the admission of a confession, in the creation of an unfair trial atmosphere, in the misconduct of the trial court—all would provide ready opportunities, which conscientious counsel might be bound to employ, to subvert the orderly effective prosecution of local crime in local courts.

**17.** 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

**18.** 420 U.S. at 108 n. 9, 95 S.Ct. at 860. It should be noted that the Court, in this footnote, indicated that *Stefanelli* presented a distinguishable problem.

That *Pugh* and the *Younger* line of cases are complementary rather than conflicting aspects of our system of federalism is made clear by the fact that *Pugh* was decided by the Supreme Court during the same term as *Duran, Hicks, Kugler,* and *Huffman.*

**19.** *Pugh v. Rainwater,* 483 F.2d 778 (5th Cir. 1973), *aff'd,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

Tuttle stated, was not applicable because the plaintiffs in the *Pugh* litigation:[20]

> sought no relief which would impede pending or future prosecutions on various charges in the state courts of Florida. Rather, while accepting that the state courts were the proper forum for consummation of criminal proceedings against them, the plaintiffs argued that the state was nevertheless obligated to submit them to preliminary probable cause hearings.

Judge Tuttle recognized that not every allegedly unconstitutional state pretrial procedure would provide a proper occasion for federal intervention. *Pugh* was such a case, however, since the relief requested was not against any state prosecution *"as such,"*[21] and because plaintiffs merely desired "to challenge an aspect of the criminal justice system [which affects a constitutional right that] cannot be vindicated in the state court trial."[22] Finally, Judge Tuttle noted that the fact that the plaintiffs could have sought identical relief in a state equitable action was not sufficient to erect a *Younger* bar to federal proceedings. *Younger*, he submitted, was not applicable in a situation where a federal claim could not be ruled upon in a single pending or future state proceeding.[23]

This case admittedly is not on all fours with *Pugh*. In *Pugh*, the state trials had not yet commenced and the relief that the plaintiffs requested would have had no direct impact on their trials. Chesimard's trial, in contrast, has already begun, and proscribing Friday sessions will admittedly have *some* effect on the state court trial. Nonetheless, I am convinced that this case is governed by the considerations articulated in *Pugh*, and that the present problem is not the type that *Younger* and *Kugler* were designed to address.

Unlike the situations in *Younger* and the cases following it, the relief sought by Chesimard is not directed at the state criminal prosecution *as such*. The *Younger* plaintiffs, in effect, attempted to block the entire state criminal proceeding. A declaration against the holding of Friday sessions, however, is surely not the equivalent of halting a state criminal action.

Nor would such a declaration have the disruptive effect on the internal processes of the state trial that federal adjudication of evidentiary questions, the relief requested in *Kugler* and *Stefanelli*, would threaten. Indeed, it appears that the relief demanded would, in no meaningful way, change the substance of Chesimard's trial or threaten the integrity of the operation of the state criminal process.

Moreover, as was the case in *Pugh*, Chesimard, within the confines of her trial, cannot win relief from the practice to which she objects—trial sessions on Fridays. This is so because Judge Appelby has ordered that the trial take place on Fridays, and each time that it does, Chesimard's constitutional rights will be abridged. It would accordingly be necessary for her to seek a delay in the proceedings in order to invoke state appellate processes. Thus, the "interference" with the trial brought on by employing state appellate remedies, if any are available, would be practically identical with the interference that would be caused by the bringing of a federal action, a factor that would distinguish this case from *Younger* and *Kugler*.

It would appear that one of the reasons for interdicting federal interference with state criminal actions is to avoid prejudice to the integrity of such proceedings. In this case the only prejudice that might flow from the trial court's not sitting on Fridays would be an extension of the length of the trial. This, of course, is a matter of some concern, particularly because the jury in this case is being sequestered. Yet, it was admitted at oral argument that no one had any objection to holding longer sessions on

**20.** 483 F.2d at 781.

**21.** *Id.* (emphasis in the original).

**22.** *Id.* at 782.

**23.** *Id.* This Court adopted a substantially similar approach in *Conover v. Montemuro,* 477 F.2d 1073 (3d Cir. 1973).

the other four weekdays, or even to having court on Saturdays.[24] If these alternatives were utilized the chance of a longer trial would, as a practical matter, evaporate, thus removing the possibility that prejudice would flow from the federal court action.

I recognize that, in a formal sense, a federal declaratory judgment that a state court, under the facts here, should not sit on Fridays may be deemed an "intrusion" upon state criminal processes. However, it is significant that the majority, in a candid fashion, concedes that this may not be so.[25] In any event, such an order, even it can be considered to be a technical interference, is in my opinion, so *de minimis* that it should not be characterized as the sort of occurrence that *Younger* and *Kugler* endeavored to prevent.

The *Pugh* doctrine, that certain controversies collateral to the basic state criminal proceeding are not subject to the mandate of *Younger*, is a necessary one. This is the case since, without the *Pugh* principle, constitutional claims, like the one asserted by Chesimard, would go without redress. Such a result would raise serious constitutional concerns because it is questionable whether the ordinarily salubrious requirements of comity have sufficient force to permit the violation of constitutional rights to go without remedy.

I would thus conclude that the relief sought by Chesimard does not pose the threat of substantial interference with a state criminal trial that the *Younger* line of cases forbids, and that federal equitable relief in this case would not be barred by the precepts of comity.[26]

### III.

Assuming that the relief requested by Chesimard does not fit within the contours of the *Pugh* doctrine, but instead constitutes sufficient interference with state criminal proceedings to bring *Younger* into play, the relief sought should, nonetheless, be granted. This is so since I believe that the peculiar congerie of facts before us would fall within the "exceptional circumstances" limitation to the *Younger* rule.[27]

Chesimard's predicament would appear to reveal rather clearly the imminence of great and irreparable harm. She is an Orthodox Muslim, and the sincerity of her beliefs has not been disputed. The Muslim faith recognizes Friday or Jumah as its Sabbath, and its tenets prohibit its adherents from attending any public function on that day.

The state judge's order that trial proceed on Fridays thus places Chesimard in a harsh dilemma. She is forced to choose between conforming to her religious precepts or at-

24. Indeed, after the opinions were filed, we were informed by counsel that the state trial court proceeded to hold trial sessions on Saturday.

25. *See* Majority Opinion at 68.

26. I also believe that the arguable availability of a state court remedy does not mean that Chesimard is unable to make out, for the purposes of a *Pugh* analysis, the traditional prerequisites for equitable relief—irreparable harm and lack of an adequate remedy at law. It is true that, if the present case represents a *Younger* situation, I would conclude that the clear availability of a state remedy might bar a finding of irreparable harm. *See* pp. 72–73 *infra.* Such would seem to be so because in *Younger*-type circumstances, a state remedy is viewed as precedent to a federal one.

　*Pugh* cases, however, are without the scope of *Younger*; instead, they are governed by the teachings of *McNeese* and *Monroe* that exhaustion of state remedies is unnecessary prior to

the invocation of section 1983. In such instances, the question is not whether the plaintiff will suffer irreparable harm in the absence of a *federal* remedy, the inquiry in *Younger* cases. Rather, the question is whether the plaintiff will be subjected to irreparable injury in the absence of *some* equitable relief, whether it be federal or state. Under such a test, the dilemma with which Chesimard is faced makes her entitlement to a remedy manifest.

27. *See* 401 U.S. at 53, 91 S.Ct. 746. In my opinion in *Helfant v. Kugler,* 500 F.2d 1188, 1204–05 (3d Cir. 1974), I expressed a concern that an exceptional circumstances category might not exist. However, Mr. Justice Stewart's opinion for the unanimous Supreme Court in that case stated that although the parameters of "extraordinary circumstances" could not be definitely laid out, that category was a legitimate exception to the *Younger* rule. 421 U.S. at 124–25, 95 S.Ct. 1524.

tending a trial on criminal charges in order to assist in her defense.

What seems to divide the Court is not whether Chesimard is threatened with serious harm on account of the proposed Friday sessions, because the majority assumes that this is so, but whether this harm is irreparable, great and immediate, and whether Chesimard lacks an adequate remedy at law so as to fall within the exceptional circumstances qualification to the *Younger* rule. These inquiries pivot primarily on the question whether Chesimard has exhausted her state appellate remedies.

I agree with my brethren in the majority that the question of exhaustion is a proper inquiry in a *Younger* situation. Although the Supreme Court has continuously held that exhaustion of state court remedies is not a precondition to obtaining relief under section 1983 [28]—the basis of Chesimard's federal action—exhaustion would nonetheless appear to be a legitimate component of the "immediate and irreparable harm" and the "no adequate remedy at law" requirements for federal intervention in *Younger*-type cases. Indeed, this is the mandate of the Supreme Court in *Huffman v. Pursue, Ltd.*[29]

The exhaustion problem here would seem to reduce to a fairly simple question, namely whether the federal courts must forbear from acting because Chesimard arguably still has available within the state system an interlocutory appeal *nunc pro tunc* to the New Jersey Supreme Court. The majority answers in the affirmative, reasoning, on the basis of *Huffman,* that a case of irreparable injury cannot be made out if a federal plaintiff has yet to utilize any remaining state appellate remedy. Because of the special circumstances presented here, I cannot agree with this proposition.

*Huffman* is a different case from the one before us. There, the state court defendant, after an adverse verdict at trial,[30] commenced a section 1983 action instead of immediately pursuing clearly available state appellate remedies. The Supreme Court held that such a deliberate bypass of the state appellate process was inimical to the spirit of comity described by *Younger.*[31]

The present case in no way represents an attempt to deprive the state appellate courts of their legitimate function. When the state trial judge, during pretrial proceedings, initially indicated that he intended to hold Friday sessions, Chesimard immediately sought leave to appeal in the state intermediate appellate court. But leave to appeal was denied. We were advised at oral argument that the only reason that leave to appeal to the New Jersey Supreme Court was not pursued at that time was the fact that the state trial judge had indicated that no pretrial proceedings would take place on Fridays. And, indeed, no pretrial motions were heard on Fridays. It was only after Judge Appelby, in January 1977, a date when the time for appeal had long since elapsed, declared that trial sessions would take place on Fridays that Chesimard commenced her federal action.

At oral argument before the original panel in this appeal, the attorneys for both Chesimard and the State indicated to this Court that Chesimard had exhausted her available state appellate remedies. No mention of the *nunc pro tunc* possibility was made at that time. Only after the motion for a stay of the panel's order was filed was there brought to our attention the possible existence of the availability of leave to appeal *nunc pro tunc* to the New Jersey Supreme Court.

Moreover, at no point has this Court been informed how amenable the New Jersey Supreme Court is to the *nunc pro tunc*

---

**28.** *See, e. g., McNeese v. Board of Educ.,* 373 U.S. 668, 671, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Monroe v. Page,* 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**29.** 420 U.S. 592, 609, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

**30.** The state court proceedings in *Huffman* were not criminal in nature. Although technically civil, they were characterized by the court as being "akin to a criminal prosecution." 420 U.S. at 604, 95 S.Ct. 1200.

**31.** *Id.* at 609, 95 S.Ct. 1200.

procedure, or how much time it is apt to consume. These factors would appear to make the present case far different from the situation in *Huffman* where the federal plaintiff was clearly seeking to avoid the process of direct appeal from an adverse state trial verdict.

In addition to these considerations, an occurrence at the *en banc* argument provides a further reason for concluding that federal action is not barred by the possible availability of a *nunc pro tunc* leave to appeal. At that argument, counsel for Chesimard stated that he was willing immediately to pursue the *nunc pro tunc* remedy if the State would agree that no Friday sessions would be held meanwhile. But the state prosecutor declined to go along with this proposal. If Chesimard is required to pursue the suggested state remedy, she will be compelled to undergo a deprivation of her rights under the first amendment on each Friday that sessions are held until there is a determination by the New Jersey Supreme Court. Consequently, I would conclude that, as a practical matter, Chesimard has exhausted her state appellate remedies for the purposes of the *Younger* doctrine.[32]

Furthermore, it should be noted that the state remedy here is not an adequate substitute for federal equitable relief. A federal decree would promptly terminate the possibility that Chesimard's first amendment rights will be violated. On the other hand, if it is necessary for her to go to the state courts for relief there would loom the possibility that Chesimard would be subjected to one or more instances where her constitutional rights would be infringed before a state remedy could be had. Such would appear to be a particularly grievous possibility given the nature of the constitutional

right in question, for if Chesimard's first amendment liberties are abridged, there does not appear to be any available mode of redress for such violations.[33]

Since, a state remedy would be insufficient to rectify Chesimard's grievance, I would conclude that she has made out a sufficient case of great, immediate and irreparable harm under the exceptions to the *Younger* rule so as to warrant federal equitable relief.

Thus, I would remand the cause to the district court with instructions to enter a declaratory judgment that the holding of Friday sessions in Chesimard's state court trial should, on the basis of the present record, not take place.

Judges MARIS and VAN DUSEN join in this opinion.

GIBBONS, Circuit Judge, with whom Judges MARIS and VAN DUSEN, join, dissenting in part.

When the Supreme Court took the *Younger v. Harris* direction this is the case that should have been anticipated. I think it was. I doubt that the Court's current majority really intends to put the free exercise of religion claim here presented beyond the reach of federal remedial law.

## I

Chesimard asserts that under the tenets of the Sunni Muslim sect of which she is a member Friday, or Jumah, is the recognized Sabbath day, and that she is a devout observer. Throughout pretrial stages in a pending criminal proceeding her first amendment claim was recognized by the State of New Jersey, when the court con-

---

**32.** It is significant that in habeas corpus proceedings, where exhaustion of state court remedies is mandated by statute, *see* 28 U.S.C. § 2254(b), courts have adopted a practical rather than a technical approach to exhaustion. *See, e. g., United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1314 n. 1 (2d Cir. 1975); *United States ex rel. Sanders v. Arnold*, 535 F.2d 848, 851–55 (3d Cir. 1976) (Adams, J., dissenting).

**33.** As Judge Gibbons has appropriately noted, *see* Opinion of Gibbons, J., at 78–79, a damage action by Chesimard would appear to be barred by the doctrine of absolute judicial immunity. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). It would also seem that the absolute prosecutorial immunity mandated by *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), would pose an equal roadblock.

sistently scheduled pretrial motions on a day other than Friday, its regular motion day. When the trial commenced, however, the court ruled that it would sit on Fridays, even though Chesimard and her counsel were willing to have court hours extended on other days, or to participate in the trial on Saturdays, and even though no one made any claim that either course would interfere with first amendment rights of other trial participants. Finding that Chesimard had a "devout interest in observing the Islamic Sabbath," the State Court ruled that while the trial would proceed on Fridays she need not appear and participate on those days. Thus she was given the choice of participating on Fridays in violation of her first amendment free exercise rights or of staying away and surrendering rights of confrontation, assistance of counsel, notice, and opportunity to be heard guaranteed by the sixth and fourteenth amendments.

## II

We note at the outset that the free exercise claim is entirely collateral to any issues bearing upon Chesimard's guilt or innocence of the pending criminal charge. Neither the sufficiency of the charge, nor the admissibility of any evidence in support of it, nor the due process by which it is to be tried, is in any way involved. The claim is solely that a trial on a given day of the week violates her free exercise rights. That claim is as completely collateral to the merits of the criminal proceeding as if it were asserted on behalf of a Roman Catholic juror objecting to participating in a trial on Sunday. The majority holds that *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) prevent "federal intervention." Presumably they would rule similarly in the juror's case.

This court, since *Cooper v. Hutchinson*, 184 F.2d 119 (3d Cir. 1950) has been committed to the view that 42 U.S.C. § 1983 is an express exception to 28 U.S.C. § 2283, an issue left unresolved in *Younger v. Harris*.[1] In *Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971) we were the first Court of Appeals confronted with the effect of the *Younger* sextet[2] on prior case law under § 1983. We held that *Younger* left unaffected the holdings in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) and *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) that the existence of a state remedy did not preclude resort to a federal forum. We held that *Younger* applied only to the extent that a federal injunctive or declaratory judgment would interfere with the state court's adjudication of the merits in a pending criminal prosecution. We reiterated this interpretation of *Younger* in *Conover v. Montemuro*, 477 F.2d 1073 (3d Cir. 1973). *Conover* was a civil rights class action seeking relief against the Pennsylvania juvenile intake procedures. We reversed the dismissal of the complaint on *Younger* grounds, reasoning:

Finally there is the narrow issue whether, even as to class members actually before the Family Court Division of the Philadelphia Court of Common Pleas, the ruling in *Samuels v. Mackell, supra*, would preclude declaratory relief of some kind. *Lewis v. Kugler, supra* at 1349, is relevant here. That case suggests that if an actual proceeding is pending, as to those class members against whom those proceedings are pending certain types of declaratory relief will be inappropriate. It holds that the federal court should not foreclose the merits of the issue of legality of a search or seizure by granting a declaratory judgment. Such a determination would in effect substitute federal

---

1. Ultimately the Supreme Court adopted the Third Circuit view on § 2283 in *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

2. *Younger v. Harris, supra; Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Boyle v. Landry*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); *Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); *Dyson v. Stein*, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); *Byrne v. Karalexis*, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

court fact finding for that already available in the state court on an issue going to the ability of the state to prove its charge. *See e. g., Stefanelli v. Minard,* 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951). This case does not present the same kind of issue. Declaratory relief with respect to the intake procedures will not necessarily hinder the eventual adjudicatory process of the Court of Common Pleas or substitute federal fact finding in any case in which a petition for adjudication of delinquency may be tried. Thus *Lewis v. Kugler, supra,* is not authority for the withholding of declaratory relief, even as to those class members presently before the Pennsylvania courts. In that case we pointed out that in the exercise of its broad equitable powers, a district court could fashion a remedy which would prevent deprivation of constitutional rights while at the same time avoiding unnecessary encroachment on state and local government functions, 446 F.2d at 1351–1352. Since a remedy with respect to the intake procedures would not necessarily interfere with the adjudication functions of the Commonwealth's juvenile court, it is therefore not necessarily precluded by *Younger v. Harris, supra,* or *Samuels v. Mackell, supra.*

477 F.2d at 1082.

Thus, by 1973 we were firmly and unanimously committed to the proposition that *Younger* applied only when the federal proceeding would effectively preempt the state court's adjudication of the merits of a pending criminal charge. Not all circuits adopted our interpretation of *Younger,* which limited its application to issues directly involved in the adjudication of guilt.[3] One Circuit which did so was the Fifth. It embraced the Third Circuit interpretation of *Younger* as early as *Morgan v. Wofford,* 472 F.2d 822, 826 (5th Cir. 1973). Eleven months later in *Pugh v. Rainwater,* 483 F.2d 778 (5th Cir. 1973), *aff'd in part and*

rev'd in part sub nom., Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) the Fifth Circuit held *Younger* inapplicable to an application for federal injunctive relief. There, petitioner complained of the state's practice of making the prosecuting attorney the judge of probable cause to hold arrestees until arraignment or trial. The Fifth Circuit also expressly rejected the contention that the availability of a state court pretrial declaratory or injunctive remedy precluded resort to a federal forum, writing:

> While the plaintiffs might have filed suit in state court for a declaratory judgment and other equitable relief based upon the same grounds as this suit, this procedure would have required a second state court proceeding to adjudicate a federal claim not based upon the merits of the defenses to the state criminal actions. *Younger* has never been applied by our circuit to force a federal court to relinquish jurisdiction over a federal claim which could not be adjudicated in a *single* pending or future state proceeding, and we decline to so apply it now.
>
> 483 F.2d at 782.

When *Pugh v. Rainwater, supra* came before the Supreme Court, it affirmed the *Younger* holding. This despite the fact that a phalanx of state Attorneys General, including the Attorney General of New Jersey, filed briefs *amici curiae* urging reversal. 420 U.S. at 104–5, 95 S.Ct. 854. The *Younger* discussion in *Gerstein v. Pugh* appears, as the majority opinion notes,[4] in a brief footnote at 420 U.S. at 108 n. 9, 95 S.Ct. at 860. It is nonetheless the unanimous holding of the Court, for all justices concurred in Part I of the opinion. The most significant feature of the brief discussion is the sentence:

> The order to hold preliminary hearings could not prejudice the conduct of the trial *on the merits. See Conover v. Mon-*

---

3. The conflicting views of other circuits are contrasted with those of the Third and Fifth Circuits in Note, Federal Equitable Relief in Matters Collateral to State Criminal Proceedings, 44 Fordham L.Rev. 597 (1975).

4. Majority Opinion at 67.

temuro, 477 F.2d 1073, 1082 (CA 3 1972); cf. Perez v. Ledesma, 401 U.S. 82 [91 S.Ct. 674, 27 L.Ed.2d 701] (1971); Stefanelli v. Minard, 342 U.S. 117 [72 S.Ct. 118, 96 L.Ed. 138] (1951). (Emphasis supplied).

The quoted sentence makes the precise distinction which we made in Conover v. Montemuro, supra, between adjudication of the merits of the criminal charge and adjudication of issues collateral to the merits, and it cites as authority for that distinction the very page in Conover v. Montemuro, quoted above, where we made that distinction. This court is bound by that approval of the distinction between issues going to the merits and issues collateral thereto.

The majority tacitly acknowledges as much. It concedes that "[p]ersuasive arguments can be made on either side of the question whether an order that requires that a pending state trial not be conducted on Fridays creates a sufficient degree of interference with the 'conduct of the trial on the merits' to require application of Younger principles," [5] but makes no attempt to marshall such arguments in support of its result. There really are none since the free exercise claim is irrelevant to the merits, and an adjudication of guilt will be no different on Saturday than on Friday. It seems clear enough to me that what the Gerstein v. Pugh Court had in mind was federal adjudication of issues which could be adjudicated on the merits in the state trial.

Recognizing that there is really no distinction between this case and Gerstein v. Pugh the majority proceeds to rely on Kugler v. Helfant, 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975) for the proposition that even if the free exercise claim is collateral to guilt determination, a federal court must nevertheless withhold relief. There is a significant problem, however, with reliance on Kugler v. Helfant. The issue in Kugler v. Helfant, involving the fifth amendment privilege against self-incrimination, was in no sense collateral to the merits of the criminal charge. There is no inconsistency between the rule laid down in Conover v. Montemuro and approved in Gerstein v. Pugh, and the holding in Kugler v. Helfant. Indeed, both this court, 500 F.2d at 1193, and the Supreme Court, 421 U.S. at 122, 95 S.Ct. 1524, made it clear that the latter case involved the "exceptional circumstances" limitation upon the Younger remedial powers rule, rather than the collateral issues rule, as to which Younger is simply inapplicable. The Supreme Court in Kugler v. Helfant differed with us as to whether the disclosed circumstances were sufficiently exceptional to warrant our adjudication of a factual dispute over suppression of a confession which could have been litigated in the criminal trial. If erroneously determined, that issue would have afforded a ground for a new trial on certiorari or habeas corpus. Kugler v. Helfant simply does not deal with issues such as the free exercise claim here, or the pretrial detention claim in Gerstein v. Pugh, which do not bear on the merits of the criminal charge, the admissibility of evidence to support it, or the fairness of the processes used in resolving it.

The majority's reliance on Huffman v. Pursue, Ltd., 420 U.S. 592, 609, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1972) is equally misplaced for the same reasons. Huffman did not enlarge the categories of issues to which the Younger rule applies. It did no more than put state quasi-criminal sanctioning proceedings on a par with state criminal sanctioning proceedings. It contains no language suggesting that the claimant of a federally protected right must resort to and exhaust state remedies collateral to the merits of a quasi-criminal enforcement proceeding before resorting to a federal forum. Nothing in the majority opinion in Huffman v. Pursue, Ltd. suggests that it was intended to cast doubt upon the holding in Gerstein v. Pugh that the Younger rule is inapplicable to collateral issues. Indeed, part VI of the opinion, 420 U.S. at 611, 95 S.Ct. 1200, remanding for further proceedings to determine if a Younger exception applies, is an express

5. Majority Opinion at 68.

holding that no enlargement of the reach of the *Younger* rule was intended. The rule was never intended to apply to issues which do not bear on guilt or liability.

Putting the issue squarely, let us suppose that, yielding to the practicalities of the state court's ruling, Chesimard attends trial each Friday. In that event, each Friday she will have been subjected to what the majority acknowledges is a significant first amendment deprivation. But assuming an otherwise error-free trial, what appellate or habeas corpus relief would be appropriate? The majority opinion is carefully circumspect on this point. Nowhere does it suggest that either the Supreme Court or a habeas corpus court would, or even could, set aside the judgment of conviction and order a new trial. It goes no further than to refer to the state's contention as to the availability of appellate review of a final order, and it relies only on the availability of state interlocutory relief.[6] The majority's circumspection is entirely appropriate, for no authority with which I am familiar would permit reversal of an otherwise errorless conviction for reasons having nothing whatsoever to do with the merits of the guilt determination. If the free exercise right in question is lost *pendente lite* it is lost for all time.[7] Even a posttrial damage remedy is foreclosed by the doctrine of judicial immunity. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

### III

Of course, if Chesimard, under compulsion of the Hobson's choice afforded by the state court ruling, were to elect to forego her right of confrontation and her right to the effective assistance of counsel, and the

trial were to proceed each Friday in her absence, a judgment of sentence would present different issues upon review. Significantly, the majority opinion does not rely upon the availability of this chimerical choice. Rather, it focuses on the availability of *pendente lite* relief in a state forum to relieve Chesimard of the necessity of making it.[8] Undoubtedly the reluctance to rely on the choice of surrendering sixth amendment rights to preserve first amendment rights reflects the majority's belief, which I share, that the very fact of being forced to make such a choice is a form of irreparable injury for which interlocutory relief should, as a matter of federal constitutional law, be afforded. *Cf. United States v. Garcia*, 544 F.2d 681, 685 (3d Cir. 1976) (Aldisert, J.) (forcing a Hobson's choice and exacting a price for the exercise of a constitutional right is impermissible). Moreover, the majority, I suspect, foresees the distinct possibility that in reviewing a final judgment in the event Chesimard elects to remain in her cell, the New Jersey appellate courts would find that she voluntarily waived her rights of confrontation and effective assistance of counsel. And if the New Jersey appellate courts should so hold, the prosecutor would most assuredly claim on certiorari that such a holding was an adequate and independent state ground, precluding both certiorari and habeas corpus relief.

Prior to May 3, 1976 I would have thought that Chesimard could safely have preserved her first amendment rights by remaining in her cell, while at the same time preserving her opportunity to obtain federal review, by certiorari or habeas corpus, of the sixth and fourteenth amendment violations resulting from the trial go-

---

**6.** Majority Opinion at 65–67. See Part IV *infra*. At oral argument before this court, counsel for Chesimard expressed willingness to seek interlocutory *pendente lite* relief before the New Jersey Supreme Court, provided that the prosecution would agree not to try the case on Fridays pending decision on that petition. The State, however, rejected any such agreement.

**7.** The majority opinion recognizes the distinction between issues which would be grounds for appellate reversal of the judgment and is-

sues which would not be, when in the last paragraph of footnote 1 it holds that *Younger* principles do not apply to a challenge to conditions of confinement. Inexplicably, it fails to acknowledge that for purposes of review of a judgment of conviction, that challenge and the free exercise challenge are identical.

**8.** Majority Opinion at 67.

ing forward in her absence. Since the decisions in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) and *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976) I am far less certain. Certainly in light of those cases, which substantially cut back on the federal waiver standard of *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) and *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), no counsel could conscientiously advise Chesimard that she could safely stay away from court on Fridays and later assert that she had been deprived by the state of her confrontation and counsel rights. While I would not find waiver I can hardly predict that, in the present judicial climate, another judge might not. The choice which the state court afforded is no choice at all, but only the offer of a gamble on the ultimate availability of federal review, against the certainty of loss of first amendment rights.

Obviously, the majority puts no stock in the availability of the choice of staying in a cell on Fridays. It relies instead, and solely relies, on the availability of collateral *pendente lite* relief in a state court.

### IV

While the court purports not to decide whether federal intervention would be justified in the absence of state procedures for interlocutory review, or upon affirmance of the challenged ruling by the state Supreme Court,[9] it is clear that the linchpin of the majority ruling is the presumed availability of a state forum which will entertain the free exercise claim *pendente lite*. Moreover, the majority must mean that as a matter of federal law a state court is, in the circumstances of this case, obliged to provide a forum which will entertain the free exercise claim *pendente lite*. Presumably, the majority intends that if the claim is meritorious, the state court must vindicate the right, and that if it does not do so some federal court will.

Such a court might be the United States Supreme Court, which could on certiorari from a final order refusing to consider and decide the claim *pendente lite* order the state court to afford a remedy.[10] There is ample authority that state courts of general jurisdiction must, as a matter of federal law, entertain actions for the vindication of federally protected rights. *See, e.g., General Oil v. Crain*, 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754 (1908); *Iowa-Des Moines National Bank v. Bennett*, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931); *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Such a federal court could also be a United States district court, which, if the state courts did not entertain and decide the claim, would not be prevented from entertaining a new § 1983 application on the merits. Certainly the state could not claim *res judicata*. The majority opinion does not suggest which federal court would rule on the question, but beneath the velvet glove of deference to the state court system for *pendente lite* relief there is plainly assumed to be the iron hand of federal law. For certainly the majority would not refer Chesimard to a state remedy which it believes the state has no binding obligation to afford.

This underlying assumption, which quite clearly is the unarticulated major premise of the majority opinion, sets in sharp relief the question what policies were intended to be advanced by the *Younger* sextet. Was the Court aiming at imposing upon lower federal court judges an appropriate deference toward their opposite numbers on the state bench? Or was the Court thinking about the appropriate interrelationship between state law and federal law, state sovereignty and federal sovereignty? The majority must opt for the first rather than the second interpretation. It withholds relief to afford the Supreme Court of New Jersey an opportunity to consider a *nunc pro tunc* application for interlocutory relief, while at the same time implying that the New Jer-

---

**9.** Majority Opinion at 67.

**10.** *But see n.12 infra.*

sey courts are obliged by federal law to entertain the claim *pendente lite.* Its interpretation becomes even clearer when it urges that "intervention here would deprive the New Jersey Supreme Court of an opportunity to review a discrete judicial ruling in a pending trial." [11] Apparently the New Jersey Supreme Court, and perhaps the trial judge, will feel better if the former makes the ruling on a federal law issue.

I think this interpretation of *Younger* trivializes what was intended to be a significant milestone, not in the relationships between federal judges and state judges, a patent irrelevancy, but in the relationship between the national law and state enforcement of its own law. It is true, of course, that the debate over fourteenth amendment "intrusion" in the state criminal justice system has often been carried on the "we-they", *ad hominem* level. *See, e.g., State v. Funicello,* 60 N.J. 60, 69, 286 A.2d 55, 59 (N.J.1972) (Weintraub, J., concurring), *cert. denied sub nom. New Jersey v. Presha et al.,* 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972).

I do not accept the proposition that Justice Black had in mind anything so small when he spoke of "Our Federalism." It seems to me that what was intended was a limitation on federal sovereignty in all its aspects, by the imposition of an obligation to give due regard to state procedural law in the state's enforcement of the criminal and quasi-criminal law. Such regard is due, under *Younger,* even when the merits of the charge also involve adjudication of federal law issues. If I am right that more was intended than a tender regard for the feelings of state court judges, then it is obvious that the *Younger* policy is invaded to precisely the same extent when federal law requires a state tribunal to give *pendente lite* relief as when federal law permits a federal tribunal to give such relief.

If, as the majority apparently assumes, the state courts must as a matter of federal law entertain an application for *pendente lite* relief from the requirement that the Chesimard trial be held on Fridays, and must grant relief if the first amendment claim is meritorious, then the degree of interference with the pending state prosecution will be identical. I fail to see how there is any distinction from the point of view of legitimate concerns of federalism, between an order interfering with trial on Fridays emanating from a lower federal court, from the Supreme Court, or from a state court, where the order is required by federal law. Either all three are precluded by *Younger* principles or none are.

I make this point not because I have any doubts that federal law requires that a state tribunal entertain Chesimard's first amendment claim *pendente lite,* for I have none. Rather, it seems to me that in relying upon the availability of interim relief in the state courts the majority has eliminated any policy support for its result which might have been derived from the *Younger* sextet. The very reason on which the majority relies for withholding federal relief cuts against any claim that the interests of federalism require that result.

V

The reason for the *Younger* sextet rule commanding that federal courts refrain from a premature adjudication of issues going to the merits of a state charge is the assumption that a post-judgment remedy by certiorari or habeas corpus affords adequate relief. The Court held that merely being subjected to trial did not amount to such irreparable injury as would make post-judgment relief inadequate. *See, e.g., Younger v. Harris, supra,* 401 U.S. at 45, 46, 91 S.Ct. 746.

That reasoning is entirely inapposite in this case, for as we point out above, the free exercise claim will never be the subject of post-judgment relief. The invasion will take place every Friday and will be completely irreparable unless *pendente lite* relief is afforded. Even if the *Younger* sextet is not, as I conclude, irrelevant to such a collateral claim, the fact of such irreparable injury would be an "exceptional circum-

11. Majority Opinion at 68.

stance" warranting relief even under those holdings. By tacitly holding, however, that the *Younger* rule is not a limitation upon federal law, but only upon lower federal courts, the majority has imposed upon the state courts the obligation of litigating claims for *pendente lite* relief on issues collateral to the state's criminal or civil charge. Let us assume that the New Jersey Supreme Court, recognizing this fact, will entertain the free exercise claim *pendente lite*. Two outcomes are possible. It will affirm the Friday trial order or it will reverse. If it reverses, the matter will be at an end. But if it affirms? At that point, the claim having been litigated, Chesimard will be unable to resort to any federal forum other than the Supreme Court. Since the subject matter—free exercise of religion during the trial—will end with the trial, a petition for certiorari would be meaningless unless accompanied by a motion for *pendente lite* relief pending its disposition. This, to me, illustrates still another defect in the majority's reasoning. Of all the courts in the country, the Supreme Court is the least capable, by reason of its limited appellate jurisdiction,[12] remoteness, the press of its business, and the institutional framework of its operations, of affording meaningful consideration of the need for *pendente lite* relief on an issue such as this. Yet the majority decision necessarily precludes review of an adverse ruling by the highest state court in an accessible federal forum, and necessarily thrusts upon the Supreme Court a responsibility it is ill equipped to discharge. I am completely at a loss to understand this sort of federalism, unless, perhaps, it is based upon the assumption that only Supreme Court Justices can be trusted to act with appropriate deference in dealing with state court judges on first amendment issues. As I said in Part IV above, such an assumption trivializes the *Younger* rule.

**12.** There is no provision for review by the Supreme Court of interlocutory orders of state courts. I would hope that the Court would treat the denial of *pendente lite* relief on a claim such as here presented as collaterally final within the meaning of the *Forgay-Cohn* doctrine. *See Cox Broadcasting Corp. v. Cahn,* 420 U.S. 469, 481–82 & n.10, 95 S.Ct. 1029, 43

## VI

The majority does not decide the merits of the first amendment claim. I have no doubt that the state court order is invalid, given that court's finding that Chesimard's Sabbatarian beliefs are sincerely held.

The right of individuals to be free from governmental restraint upon their free exercise of religion is the first stated and among the most carefully guarded of the rights enumerated in the Bill of Rights. *Sherbert v. Verner,* 374 U.S. 398, 407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Marsh v. Alabama,* 326 U.S. 501, 509, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945). The significance of the right is not diminished by an individual's status as a defendant in a criminal prosecution. *See Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Where a person's right to the free exercise of religion is inhibited by state action, the courts will scrutinize the state's chosen means of attaining its goals to determine whether the state has met its obligation to avoid, to the extent possible, infringement of the protected freedom. *Cantwell v. Connecticut,* 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); see *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *United States v. Robel,* 389 U.S. 258, 264–68, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). The governmental goal or purpose itself will be value-weighed against the protected right of the individual to determine which should prevail, and a purpose of obtaining a government objective even of the highest order, will not justify the imposition of restraint upon the free exercise of religion unless the objective cannot otherwise be achieved.[13] *Wisconsin v. Yoder,* 406 U.S.

L.Ed.2d 328 (1975). *But see id.* at 501–512, 95 S.Ct. 1029 (Rehnquist, J., dissenting).

**13.** We note that in *United States v. Robel,* 389 U.S. 258, 268 n.20, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), the Supreme Court declined to employ the balancing of the interests test and rested its decision on the existence of alternative meth-

**82**

205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972);[14] *Sherbert v. Verner,* 374 U.S. 398, 407 (1963); *Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

The state's concern for the efficient and speedy administration of justice in an environment conducive to due process is undoubtedly a significant state interest. *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). In *Cox* the state's interest in the integrity of the criminal process was a compelling and overriding one because the orderly administration of justice was threatened by the individuals' exercise of the right of free speech; however, in the present case, the efficient and orderly administration of justice is not placed in jeopardy by the removal of one of the five trial days ordinarily available to the court and the petitioner's observance of her religious faith in itself poses no threat to the administration of justice.

In balancing the state interest in prompt criminal trials against the petitioner's right to observe her religious beliefs, given the facts of this case with the alternatives available to achieve the state's purpose and the limited nature of the disruption of orderly trial proceedings caused by not conducting the trial on Fridays, the petitioner's request should have been honored.

It is apparent from the majority's studied delicacy in discussing the free exercise claim that it does not disagree with the foregoing first amendment principles or even with the conclusion that the free exercise claim should have been honored. It denies relief solely on the ground that the *Younger* rule precludes it. Since I think the majority has misconstrued the *Younger* cases and disregarded the controlling precedent, *Gerstein v. Pugh, supra,* I would remand to the district court for the entry of a

ods, having a less drastic impact on first amendment freedoms, by which the Government could have achieved its purpose without use of the methods chosen.

**14.** In *Wisconsin v. Yoder, supra,* the Court said at pages 214 and 215, 92 S.Ct. at page 1532: "[A] State's interest . . ., however highly we rank it, is not totally free from a balancing process when it impinges on fun-

declaratory judgment that the state should have honored Chesimard's free exercise claim by refraining from conducting her trial on Fridays. I have no doubt that such a judgment would be honored by the state courts, and thus that injunctive relief would not be necessary.

**VII**

I agree with the dispositions of Chesimard's remaining claims in the manner set out in footnote 1 of the majority opinion, and to that extent join in the court's judgment.

damental rights and interest, such as those specifically protected by the Free Exercise Clause of the First Amendment.

. . . .

The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."